LARRY L. BAUMBACH
SBN 50086
Law Office of Larry L. Baumbach
2531 Forest Avenue, Suite 100
Chico, California 95928
Telephone:  (530)891-6222
Fax:  (530)893-8245

Attorneys for Plaintiffs
KATHERINE and WILLIAM ROBINSON

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHERINE ROBINSON; and WILLIAM ROBINSON,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　　vs.<br><br>COUNTY OF SHASTA; SHASTA SHERIFF'S DEPARTMENT; CITY OF REDDING; CITY OF REDDING POLICE CHIEF, ROBERT F. PAOLETTI; REDDING POLICE OFFICER, CORPORAL M. WOODS, BADGE #321; REDDING POLICE OFFICER, A. HOLLEMON, BADGE #168; and REDDING POLICE OFFICERS as DOE 1 through DOE 50.<br><br>　　　　　　　　　　Defendants | Case No.: 2:14-cv-02910-KJM-KJN<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFEDANTS MOTION FOR SUMMARY JUDGMENT**<br><br><br>Date: September 8, 2017<br>Time: 10:00 a.m.<br>Courtroom: 3, 15th Floor |

i

1

**TABLE OF CONTENTS**

2

I.    INTRODUCTION.................................................................................1

II.   STATEMENT OF FACTS.................................................................1

III.  LEGAL ARGUMENT.........................................................................3

     A. LEGAL STANDARD.................................................................3

            1. Section 1983 Claims.................................................4

            2. Defendant Officers Are Not Entitled To Qualified Immunity.............7

            3. Defendant's Mutual Participation Constituted Integral Participation...8

     B. VIOLATION OF PRINCIPLES OF TRAINING .......................................9

     C. PLAINTIFF'S EXPERT REPORT IS RELEVANT EVIDENCE OF REASONABLENESS OR UNREASONABLENESS.....................................10

     D. SURVIVORS RIGHTS.................................................................13

     E. WOODS IS NOT ENTITLED TO QUALIFY IMMUNITY...........................14

      F. ROBINSON DISCOVERED TO NOT BE BREATHING.......................16

IV.   CONCLUSION.............................................................................21

IV. MUNICIPAL LIABILITY (MONELL LIABILITY).....................................22

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFEDANTS
MOTION FOR SUMMARY JUDGMENT

1    **TABLE OF AUTHORITIES**

2

3                                    **Cases**

4    *Acri v. Varian Associates, Inc.*
5    114 F.3d. 999, 1001 (Ninth Cir.1997) …………………………………….……10

6    *Anderson v. Liberty Lobby Inc.*
7    *477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)*…………………….*3,4*

8    *Arce v. Blackwell*
     294 Fed.Appx. 259, 262 (Ninth Cir. 2008)…………………………………….………7
9

10   *Avina v. U.S.*
     681 F.3d. 1127, 1130 (Ninth Cir. 2012)…………………………………………….5
11

12   *Bel-Montez v. City of Stockton*
     2017 WL2633412 (E.D. Cal. 2017)……………………………………………….21
13

14   *Billington v. Smith*
     292 F.3d. 1177, 1185 (Ninth Cir. 2002)……………………………………19, 20
15

16   *Boyd v. Benton City*
     374 F.3d. 773, 780 (Ninth Cir. 2004)………………………………………….8,9
17
     *Brian v. MacPherson*
18   630 F.3d. 805, 826 at 825 (Ninth Cir. 2010)…………………………………………7

19   *Byrd v. Guess*
     137 F.3d. 1126 (Ninth Cir. 1998) cert denied 525 U.S. 963 (1998)……………….14
20

21   *Celotex Corporation v. Catrett*
     477 U.S. 317, at 322-323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)…………..*3,4*
22

23   *Chaudhry v. City of Los Angeles*
     751 F.3d. 1096, at 1102-1105 (Ninth Cir. 2014) ………………………………….*13*
24

25   *Chuman v. Wright*
     76 F.3d. 292, 295 (Ninth Cir. 1996)………………………………………………8
26
     *Corrs v. Anne Lamire v. California Department of Corrections and Rehabilitation*
27   726 F.3d. 1062, 1075 (Ninth Cir. 2013)………………………………………….*14*

28

iii

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS
MOTION FOR SUMMARY JUDGMENT

*Deorle v. Rutherford*
272 F.3d. 1272, 1279 (Ninth Cir. 2001)……………………………………...5,18,19

*Drummond v. City of Anaheim*
343 F.3d.1052, 1056 (Ninth Cir. 2009)…………………………………5,7,8,9,12

*Espinoza v. City and County of San Francisco*
598 F.3d. 537, (Ninth Cir. 2010)………………………………………………12

*Felder v. Kaycee*
487 U.S. 131, 142 (1988)………………………………………………………13

*Glenn v. Washington City*
673 F.3d 864, 871 (Ninth Cir. 2011)……………………………………4,5,10

*Gomez v. Talido*
446 U.S. 635, 639, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)………………..……4

*Gonzalez v. City of Anaheim*
747 F.3d. 789, at 794-795, (Ninth Cir. 2014)…………………………………5,13

*Gonzalez v. Ysleta Independent School District,*
996 F.2d. 745 (Fifth Cir. 1993)………………………………………………22

*Graham v. Connor*
490 U.S. 386, 109 S.Ct. 1985, 104 L.Ed.2d 443 (1989)…………………………4,5

*Hopkins v. Bonvicino*
573 F.3d. 752, 770 (Ninth Cir. 2009)…………………………………………9

*Johnson v. Bay Area Rapid Transit District*
724 F.3d. 1159, at 1168-1170 (Ninth Cir. 2013)…………………………………14

*Johnson v. Cortes,*
2011 WL445921 (N.D. Cal. 2011)……………………………………………20

*Johnson v. Glick*
481 F.2d. 1028 (C.A.2 1973)…………………………………………………20

*Jones v. Williams*
297 F.3d. 930, 936 (Ninth Cir. 2002)………………………………………9

*Kelson v. City of Springfield*
767 F.2d. 651 (Ninth Cir. 1985)………………………………………………14

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS
MOTION FOR SUMMARY JUDGMENT

*Kingsley v. Hendrickson*
135 S.Ct. 2466 (2015)…………………………………………………………………20,21

*Larenz v. City of Los Angeles,*
946 F.2d. 630 (Ninth Cir. 1991)……………………………………………………22

*Leer v. Murphy*
844 F.2d. 628, 632-633 (Ninth Cir. 1988)………………………………………4

*Liston v. County of Riverside*
120 F.3d. 965, 976 (Ninth Cir. 1997)……………………………………………5

*Luchel v. Hagemann*
623 F.3d. 975, 980 (Ninth Cir. 2010)…………………………………………12

*Margolis v. Ryan*
140 F.3d. 850, 852 (Ninth Cir. 1998)………………………………………15

*Matsushita Electric Industrial Co., LTD., et al., v. Zanith Radio Corporation et al.*
475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)…………………………3

*McFadden v. Sanchez*
710 F.2d. 907, 911 (Second Cir. 1983) cert denied 464 U.S. 961 (1983)………13

*Melear v. Spears*
862 F.2d. 1177, 1186 (Fifth Cir. 1986)……………………………………………8

*Monell v. Department of Social Services,*
436 U.S. 658 (1978)………………………………………………………………22

*Moran v. State of Washington*
147 F.3d. 839, 844 (Ninth Cir. 1998)………………………………………15

*Moreland v. Las Vegas Metropolitan Police Department*
159 F.3d. 365, 371 (1998)……………………………………………………14

*Moreno v. Baca*
431 F.3d. 633,638 (Ninth Cir. 2005)………………………………………4

*Reeves v. Sanderson Plumbing Products Inc.*
530 U.S. 133, 150, 120 S. Ct. 2097, 147 L.Ed.2d 105 (2000)…………………3

*Reynolds v. County of San Diego*
84 F.3d 1162, 1170 (Ninth Cir. 1996)………………………………………10

v

*Sandoval v. Hish*
461 Fed.Appx. 568, 569 (Ninth Cir. 2011)……………………………………………8

*Smith v. City of Hemet*
394 F.3d. 689, at 705-707 (Ninth Cir. 2005)……………………………………7,10

*Tennessee v. Garner*
*471 U.S. 1, at 7-8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)*…………………………4,7

*42 U.S.C. § 1983* ……………………………………………………………...4,3

## RULES

Fed. Rules Civ. Proc. 56…………………………………………………………….. 3,4

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS
MOTION FOR SUMMARY JUDGMENT

1

# I. INTRODUCTION

2    On July 19, 2014, Plaintiff's decedent son Matthew Robinson suffered a serious
3    setback due to his mental condition known as bi-polar. The onset of Matthew's (M)
4    besetment occurred during his college years at California State University, Chico
5    (CSUC). Despite the severe disability of mood disorder of manic (bipolar disease) with
6    paranoid features, Matthew was able to regulate and control his condition through
7    medication and counseling. Despite treatment Matthew ended up being declared
8    unable to care for himself under § 5150 of California Welfare and Institution Code. As
9    part of his treatment at Enloe Hospital in Chico, CA, Enloe prescribed Matthew be
10   transported to a locked facility in Redding, CA known as "Restpadd".  Upon arriving at
11   Restpadd, Robinson grew paranoid and agitated. Restpadd requested that Robinson
12   be taken to a hospital to calm down and be medicated. Redding Police were called to
13   assist, but when Defendant Officer Woods arrived he expressed great hostility to the
14   request for assistance calling it "Butte County Bullshit". Woods then confronted
15   Robinson, threatening to bring in a bunch of officers and "beat his fucking ass". Once
16   Robinson was out of the transport vehicle he was taken to the ground by Defendant
17   Woods and Defendant Officer Hollemon. Robinson was forcibly restrained and hog tied
18   face down after Woods hit him repeatedly in the face with a metal OC Spray Canister,
19   fracturing his nose and cutting into his muscle tissue above his left eye. Another
20   Officer, Smyrnos, places a garment called a "spit mask" over Robinson's head, despite
21   the manufacturers warning not to use the mask where blood and saliva are present.
22   Shortly after the placement of the mask, an unknown person described Robinson as
23   "not breathing". Despite attempt at resuscitation, Robinson died several days later.

24

# II. STATEMENT OF FACTS

25   Matthew Robinson was the 32 year old son of Plaintiff's Katherine and William
26   Robinson. On the early evening of July 19, 2014 a medical decision was made to
27   transport Matthew from Enloe Hospital in Chico, CA to Restpadd Mental Hospital in
28   Redding, CA some 65 minutes away. (Plaintiffs Statement of Facts (PSF) #1).

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFEDANTS
MOTION FOR SUMMARY JUDGMENT

1    Just prior to arrival in Redding, Matthew Robinson began anxiously expressing

2    the belief that the driver, Schneider, was driving recklessly and that they were being

3    pursued. (PSF#3) Restpadd personnel refused to accept Robinson in an agitated state.

4    (PSF#5) Schneider decided to call Redding Police Department for assistance in

5    removing Robinson from the back of the vehicle. (PSF#6) When Redding Police

6    Officer, Woods a defendant, arrived he stated in an angry voice, "smells like a bunch of

7    Butte County bullshit dumped in our lap and I'm not fucking happy." (PSF#7) Defendant

8    Woods stated he did not believe that the police should have to handle this call.

9    (PSF#8) Woods showed his flashlight into the rear of the transport vehicle (PSF#8).

10   Woods told Robinson that if he didn't calm down he would call a bunch of officers to the

11   scene and beat Robinson's fucking ass. (PSF#9) Defendant Woods and Redding

12   Police Department Defendant Officer Hollemon knew Robinson was a mentally ill

13   patient and not a criminal. (PSF#10,11) Defendant's Woods and Hollemon did not

14   devise a plan nor did they consult with Restpadd personnel before removing Robinson

15   from the transport vehicle. (PSF#12,14) Woods threatened to pepper spray Robinson

16   (PSF#15) During the removal, Robinson's hand struck Defendant's Hollemon's elbow

17   (PSF#17) Woods took Robinson down to the ground and struck Robinson in the face

18   with the pepper spray can, cutting Robinson's face, breaking Robinson's nose and at

19   least two ribs. (PSF#19). Although Robinson was bleeding profusely and sweating,

20   Defendant Police Department Officer Smyrnos placed a spit mask over his head.

21   (PSF#22,23) Due to the presence of bleeding, mucous and sweat use of a spit hood

22   was contradicted. (PSF#24,25) As he lays face down Robinson was discovered to not

23   be breathing (PSF#50) Tests of spit hood confirmed that the material does not

24   transport air if wet with blood and mucous. (PSF#25) Robinson died at Mercy Medical

25   Center   July 27, 2014. (PSF#61) Shasta County Medical Examiner Dr. Katherine

26   Raven performed the Postmortem Examination on July 28, 2014. (**Plaintiffs's Ex.2**)

27   Raven testified that Robinson did not die from "excited delirium" because Robinson did

28   not have an elevated body temperature nor was there a presence of methamphetamine

2

1  or cocaine in Robinson's system. (PSF#54)  On December 12, 2014 another medical
2  examiner, Arnold R. Josselson M.D., retained by Shasta County reviewed medical
3  records and declared Robinson died of cardiac arrest after experiencing excited
4  delirium **(Plaintiff's Ex. 3)** Upon being admitted to Mercy Medical Center, Robinson,
5  was described with the following conditions: "Soft tissue swelling over the left zygoma,
6  molar eminence, and infraorbital region, Mildly displaced anterior nasal bone fracture."
7  Twelfth and tenth rib fractures, "acute cardiopulmonary arrest with return of
8  spontaneous circulation. Acute left forehead contusion." **(Plaintiff Ex.4)**

9  **III. LEGAL ARGUMENT**

10 **A. Legal Standard**

11        Summary Judgment is appropriate when there is no genuine issue as to any
12 material fact and the moving party is entitled to judgment as a matter of law (Fed.
13 Rules Civ. Proc. 56). At summary judgment, a courts function is not to weigh the
14 evidence and determine the truth, but to determine whether there is a genuine issue for
15 trial. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249, 106 S.Ct 2505, 91 L.Ed.2d 202
16 (1986). The court must draw all reasonable inferences in favor of the nonmoving party,
17 and it may not make credibility determinations or weigh the evidence.  *See Id., at 255,*
18 *106 S.Ct. 2505; See also Reeves v. Sanderson Plumbing Products Inc.,* 530 U.S. 133,
19 150, 120 *S. Ct. 2097, 147 L.Ed.2d 105 (2000).* But if the evidence of the non-moving
20 party is merely colorable or is not significantly probative, summary judgment may be
21 granted. *See Anderson,* at 249-250, 106 *S.Ct.* 2505. A fact is "material" if its proof or
22 disproof is essential to an element to Plaintiffs case. *Celotex Corporation v. Catrett,*
23 477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual dispute is
24 "genuine" if the evidence is such "that a reasonable jury could return a verdict for the
25 non-moving party" Id., at 248, 106 S.Ct. 2505. "Where the record taken as a whole
26 could not lead a rational trier of fact to find for the nonmoving party, there is no genuine
27 issue for trial" *Matsushita Electric Industrial Co., LTD., et al., v. Zenith Radio*
28 *Corporation et al.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFEDANTS
MOTION FOR SUMMARY JUDGMENT

1   The moving party bears the initial burden of informing the court of the basis for

2   its motion and or identifying those portions of the pleadings and discovery responses

3   that demonstrate the absence of a genuine issue of material fact for trial. *Celotex,* 477

4   U.S. at 323, 106 S.Ct. 2548. If the moving party meets its initial burden, the nonmoving

5   party must go beyond the pleadings and by its own affidavit or discovery, set forth

6   specific facts showing that there is some genuine issue for trial in order to defeat the

7   motion. See Fed. Rule of Civ. Proc. 56(c); *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

8   **1. Section 1983 Claims**

9   42 U.S.C. §1983 provides a cause of action for deprivation of "rights, privileges

10   or immunities secured by the Constitution or laws of the United States," a person acting

11   "under color of any statute, ordinance, regulation, custom, or usage." *Gomez v. Talido,*

12   446 U.S. 635, 639, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). To succeed in asserting the

13   Section 1983 claims, Plaintiff's must demonstrate that the action occurred "under color

14   of state law"; and that it resulted in the deprivation of a Constitutional or Federal

15   Statutory right. *Leer v. Murphy,* 844 F.2d. 628, 632-633 (Ninth Cir. 1988).  As the

16   moving party, Defendants bear the initial burden on Summary Judgment of pointing out

17   "an absence of evidence to support Plaintiffs case." *Celotex* 477 U.S. *at* 325, 106 S.Ct.

18   2548. It is also Defendants burden to prove that they are entitled to qualified immunity.

19   *Moreno v. Baca,* 431 F.3d. 633, 638 (Ninth Cir. 2005). Here the parties agree that

20   Defendants acted under color of state law, but dispute whether they violated the

21   decedents Fourth Amendment rights.

22   The Fourth amendment requires law enforcement officer making an arrest to

23   use only an amount of force that is objectively reasonable in light of the circumstances

24   facing them. *Tennessee v. Garner,* 471 U.S.1, 7-8, 105 S.Ct. 1694, 85 L.Ed.2d 1

25   (1985). To determine the objective reasonableness of a particular use of force is a

26   three step inquiry. *Glenn v. Washington City,* 673 F.3d. 864, 871, (Ninth Cir. 2011);

27   *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In the

28   *Graham* analysis, a court must "first asses the quantum of force used to arrest the

4

Plaintiff by considering the type and amount of force inflicted. *Drummond v. City of Anaheim,* 343 F.3d.1052, 1056 (Ninth Cir. 2009) *quoting Deorle v. Rutherford,* 272 F.3d. 1272, 1279 (Ninth Cir. 2001)." The Second step is to determine the government's countervailing interest at stake. Relevant factors to this inquiry include but are not limited to, the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, or whether he is actively resisting or attempting to evade arrest by flight. *Graham,* 490 U.S. at 396. "The relevant factors include the availability of less intrusive alternatives to the force employed, were the proper warnings given, or whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn,* 673 F.3d. at 872.

The reasonableness of force used is ordinarily a question of fact for the jury. *Liston v. County of Riverside,* 120 F.3d. 965, 976 (Ninth Cir. 1997). "Because the excessive force inquiry nearly always requires a jury to sit through disputed factual contentions and to draw inference therefrom the Ninth Circuit has held on many occasions that Summary Judgment or Judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. U.S,* 681 F.3d. 1127, 1130 (Ninth Cir. 2012). The Ninth Circuit has cautioned that excessive force cases pose a particularly difficult problem "especially were cases involve an in custody death, because "the witness most likely to contradict an officers story is not available to testify." *Gonzalez v. City of Anaheim,* 747 F.3d. 789, 794-795, (Ninth Cir. 2014). In Such cases the evidence should be carefully examined "to determine whether the officers' story is internally consistent and consistent with other known facts. *Id.* Explaining that "we must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflict and draw reasonable inferences from proven facts" The Ninth Circuit has held that "Summary Judgment should be granted sparingly" in such cases. *Glenn,* 673 F.3d. at 871.

Here the Defendants were made aware of decedent Robinson's mental status before they ever encountered him directly. Officer Woods began his application of

5

1    excessive force by shining the patrol car spotlight into the passenger compartment,
2    where Robinson was held and then shining his own flashlight into Robinsons face.
3    (PSF#9) The second phase of Woods excessive use of force was the verbal threat of
4    telling Robinson that unless he got out of the back of the vehicle Woods was going to
5    bring "a bunch of officers down there and beat his fucking ass."(PSF#9) The next use
6    of excessive force by Woods was that of aiming a pepper spray canister at Robinson,
7    and threatening to spray him in the face with it. (PSF#15) The next step of excessive
8    force was the grabbing of Robinson when he appeared to willingly get out of the vehicle
9    and the grabbing of his wrist by Hollemon and Woods. Woods then enveloped
10   Robinson in a bear hug which is a disfavored police tactic for reasons that are obvious
11   in this case in that it connects the person who is being controlled with the controller in
12   such a fashion that neither is free to act. In this case Woods, whose weight is in excess
13   of 270lbs and is 6' ft. tall and outweighed the decedent by 60lbs grabbed Robinson in a
14   bear hug and took him to the ground either deliberately or accidentally. Either way the
15   result of falling to the ground was due to the lack of preparation and proper police
16   procedures by Woods. Woods previously expressed hostility to the very presence of
17   Robinson when he told transport driver that he was "sick of people bringing Butte
18   County bullshit to Shasta County". Woods subsequent treatment of Robinson
19   demonstrated clearly the aggressive hostility that Woods held for the circumstances in
20   which he found himself. Once Woods ended up lying on his back and under Robinson,
21   without thought or reason, Woods decided to punish Robinson for the mess himself
22   and Hollemon had made of what should have been a rather simple procedure.
23   Nevertheless, Woods using his OC spray canister with metal edges, bashed Robinson
24   in the face with it as hard and fast as he possibly could estimating the blows to be as
25   many as five. (PSF#19, 20) The photographs accompanying this motion show
26   Robinson's face to be anything but as described in the moving papers "simple
27   abrasions".**(Plaintiff's Ex.5)** The additional hog-tie of Robinson by Woods, Smyrnos,
28   and the remaining officers exacerbated the condition, and were topped off by the

6

application of a spit mask notwithstanding that all indications for its use were negative.

(PSF#22) Smyrnos was unaware as was Woods, that Robinson had spit and Smyrnos

placed the mask on Robinsons face despite the fact that Robinson had suffered a

broken nose, two fractured ribs, and a very large laceration through muscle tissue

above his left eye with possible damage to underlying brain tissue. (PSF#23,60) The

result of the events just described constitutes the application of lethal force to a person

who had committed no crime, but was merely a mental patient in need of police

protection.

The definition of "lethal force" is that which "creates a substantial risk of death or

serious bodily injury" *Brian v. MacPherson,* 630 F.3d. 805, 826, *at* 825 (Ninth Cir. 2010)

citing *Smith v. City of Hemet,* 394 F.3d. 689, at 705-707 (Ninth Cir. 2005). Interpreting

the facts in the light most favorable to the Plaintiffs for the purpose of Summary

Judgment, the alleged various uses of impact blows constitute lethal force. See *Id. at*

*825 note 7.*

Defendant Woods testified that once he got out from under decedent Robinson,

he rolled him over and laid on top of him pressing him down to the ground holding him

down by his body weight of 270lbs. (PSF#30) Prevailing precedent in the Ninth Circuit

is that law enforcement officers use of body weight to restrain a prone and handcuffed

individual in an agitated state, can cause suffocation "under the weight of restraining

officers" therefor, such conduct maybe considered deadly force. *Gonzalez,* Supra. 343

F.3d. at 1056-1057 see also *Arce v. Blackwell*, 294 Fed.Appx. 259, 262 (Ninth Cir.

2008) known as "compression asphyxia" prone and handcuffed individuals in an

agitated state have suffocated under the weight of restraining officers.)

**2. Defendant Officers are not entitled to qualified immunity**

The Supreme Court case *SupraTennessee,* 471 U.S. 1, 105 S. Ct. 1694, 85

L.Ed.2d 1 (1985) is sufficient to demonstrate that prior to May 7, 2013, clearly

established case law existed to give Defendants fair notice that using lethal force

against a mentally ill person would be Unconstitutional. *Drummond Supra, a Ninth*

7

1  *Circuit case from 2013,* demonstrates that prior to the incident the law was clearly

2  established that multiple officers alleging use of prolonged body weight pressure to a

3  subjects back was known to be capable of causing serious injury or death. *See*

4  *Drummond,* 343 F.3d at 1056,*See also Sandoval v. Hish,* 461 Fed.Appx. 568*, 569*

5  *(Ninth Cir.* 2011) Finding that the use of physical restraints "would've violated the

6  decedents clearly established right to be free from excessive force at the time of the

7  incident" and thus defendants were not entitled to qualified immunity. *Drummond, 343*

8  *F.3d. at 1061-1062.* Moreover, *Drummond* is sufficiently similar to the specific context

9  of this case that it clearly warned officers that when a suspect is handcuffed and prone

10  on the ground, further restraint measure if applied as alleged here would be

11  Unconstitutional. Particular enlargement of Defendants violations of Robinson's rights

12  is the application of the spit hood, when both officers' observations did not justify its

13  use and the manufacturers warning advising them that suffocation could occur in the

14  presence of bodily fluids such as nasal discharge, mouth saliva, blood, and sweat.

15  Furthermore, the experiments conducted by Plaintiff's expert David Kagan Ph.D.

16  objective testing, demonstrate clearly that the spit hood device acts as a suffocating

17  cloth once it is filled with bodily fluids such as, blood and saliva as nasal discharge,

18  mouth saliva, blood, and sweat. **(Plaintiff Ex. 6)**

19          **3. Defendants Mutual Participation Constituted Integral participation**

20          A Plaintiff may hold multiple law enforcement officers liable based on an

21  "integral participant" theory of liability when at least one officer violates the Plaintiffs

22  Constitutional rights. *Chuman v. Wright,* 76 F.3d. 292**,** 295 (Ninth Cir. 1996). To make a

23  determination the court evaluates whether the officer was a "full active participant" in

24  the alleged Constitutional violation *Boyd v. Benton City,* 374 F.3d. 773, 780 (Ninth Cir.

25  2004) *quoting*, Melear v. Spears 862 F.2d. 1177, 1186 (Fifth Cir. 1986). An officer is an

26  "integral participant" where he or she "participated in some meaningful way" in the

27  actions that would give rise to Constitutional violation *Id. at 781.* The Defendant officers

28  acted unconstitutionally and although an individual officer did not necessarily

8

---

1  participate in every application of excessive force, they were fundamentally involved in

2  the altercation with Robinson and thus, are liable under the integral participation

3  doctrine. *See Jones v. Williams,* 297 F.3d. 930, 936, (Ninth Cir. 2002). "Integral

4  participation requires some fundamental involvement in the conduct that allegedly

5  caused the violation." Not only is there underlying violated conduct, for all the reasons

6  addressed at length above, the doctrine of integral participation "extends liability to

7  those actors who were an integral participants in the Constitutional violation, even if

8  they did not engage in the Unconstitutional conduct themselves. *Hopkins v. Bonvicino,*

9  573 F.3d. 752, 770 (Ninth Cir. 2009). *See also Boyd,* 374 F.3d. 773 (Ninth Cir. 2004)

10  ("Integral participation does not require that each officers actions themselves rise to the

11  level of a Constitutional violation").

12

13  **B. Violation of Principals of Training**

14       The Officers: Hollemon, Smyrnos, and Woods violated the principals of their

15  training in their conduct toward Robinson. California post trains that during contact with

16  an emotionally disturbed or mentally ill person ("EDP") the "situation can be

17  unpredictable and escalate quickly"(Appendix B, Post-learning domain 37 Pg 4-12).

18  Officers are instructed to calm the situation by using the following tactics:

19       • Request Backup

20       • Move Slowly

21       • When possible, eliminate emergency lights and sirens and dispersed any

22            crowd that may have gathered

23       • Assume a quiet, non-threatening manner when approaching and

24            conversing with the individual

25       • If possible avoid physical contact, if no violence or destructive acts have

26            taken place

27       • If possible explain intended actions before taking action

28       • Take time to assess the situation

1  • Provide reassurance that officers are there to help

2  • Give the person time to calm down

3  Post also instructs Officer to communicate with the EDP:

4  • Keep sentences short

5  • Talk with the individual in an attempt to determine what is bothering that

6  person

7  • Acknowledge the persons feelings

8  • Ask if the person is hearing voices and if so, what are they saying

9  • Avoid topics that may agitate the person

10  • Allow time to consider questions and be prepared to repeat them

11  (Appendix B, post learning domain 37, Pg 4-12, 4-13)

12  Additionally, post trains police officers, "do not threaten the individual with arrest

13  or in any other manner" explaining that "threats may create additional freight, stress or

14  potential aggression." (Appendix B, Pg. 4-13)

15

16  **C.   PLAINTIFF'S   EXPERT   REPORT   IS   RELEVANT   EVIDENCE   OF**

17  **REASONABLENESS OR UNREASONABLENESS (Report attached as Ex.7)**

18  See *Glenn v. Washington County* 673 F.3d. 864, 877 (Ninth Cir. 2011), *Smith v.*

19  *City of Hemet,* 394 F.3d. 689, 703 (Ninth Cir. 2005), *Reynolds v. County of San Diego,*

20  84 F.3d 1162, 1170 (Ninth Cir. 1996) <u>overruled on other grounds</u> by *Acri v. Varian*

21  *Associates, Inc.,* 114 F.3d. 999, 1001 (Ninth Cir. 1997). Plaintiff's expert Dr. Martinelli,

22  whose report and qualifications are attached hereto, stated his opinion that: 1) both

23  officers Woods and Hollemon had received sufficient law enforcement training to be

24  able to properly assess Robinson, to determine whether he was experiencing a

25  psycho-medical emergency requiring medical intervention that was beyond their scope

26  of knowledge 2) as discussed in opinion No.1 Robinson demonstrated, in the officers

27  presence, more than sufficient verbal, physical, behavioral and psychological cues that

28  he was experiencing a mental health disorder in concert with an acute psycho-medical

10

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS
MOTION FOR SUMMARY JUDGMENT

emergency to provide both officers with reasonable suspicion and probable cause to believe that he was gravely disabled and require immediate medical intervention, 3) while both officers Woods and Hollemon admit that they believed that Robinson was suffering from a mental health disorder and an acute psycho-medical emergency, neither officer followed their training. Contrarily the officers treated Robinson as a suspect in their responses to him, even though both officers were aware that Robinson had committed no crimes and had not posed a threat to transport driver Schneider nor themselves prior to forcibly removing him from the transport vehicle. (PSF#10, 11,16) 4) Officer Woods and Hollemon had a community caretaking responsibility to immediately call emergency medical services to triage and treat Robinson's psycho-medical emergency. The officers breached their duty to Robinson by taking ill-considered unplanned, unnecessarily, reckless and dangerous law enforcement actions culminating in a serious use of force upon him. 5) Officer Woods and Hollemon law enforcement actions upon Robinson were inconsistent with their law enforcement training and fell below state and nationally recognized, accepted, and applied professional law enforcement standards of care (CA-Post LD No. 31 Chp.1, Sec 1-3; 37, Chp1, Sec 1-7; 4-14; 4-28). Officers Woods and Hollemon were aware that Robinson's psycho-medical emergency required immediate medical care, but breached their duty to the decedent to ensure that he was delivered to the nearest hospital to receive that care. The officers' actions were inconsistent with their mental-health and disabled persons training and fell below state and national recognized accepted and applied professional law enforcement standards of care (CA-Post LD No.37). Dr. Martinelli also was of the opinion that, Officer Woods use of force upon Robinson was unnecessary, excessive and inconsistent with his law enforcement training; and not in compliance with the codified professional standards of law enforcement care. Dr. Martinelli also observed that officers are specifically trained that they are not allowed to strike the head of a resistant or combative subject with any impact weapon unless they reasonably believe that the subject possess an imminent threat of serious bodily injury

11

1    or death.  Officers are taught that strikes to the head with an impact weapon can cause
2    serious injury or death (CA-Post LDS No.20, 33 Chp.1-12, 7-5).

3        Dr. Martinelli also noted that Corporal Smyrnos, use of his spit mask upon
4    Robinson was inconsistent with how officers' are trained to appropriately and properly
5    use the spit mask. His use of the spit mask upon Robinson is also contrary to the
6    manufacturer's instructions on the proper use of that device. In the manufacturer's
7    written "conditions for use", they specifically caution, "do not use on anyone who is
8    vomiting, having difficulty breathing, or bleeding profusely from the mouth or nose
9    areas."

10       It should be noted that the autopsy and medical findings were, Matthew
11   Robinson had two fractured ribs, a broken nose, and facial lacerations of the facial
12   muscles. (PSF#60)

13       An additional expert witness report on spit mask testing by Dr. Kagan, Ph.D
14   Professor of Physics and Emeritus from California State University, Chico
15   demonstrated rapid passage of air where no fluid is present in the mask and a subdued
16   passage of air when only water is present on the mask but an almost total blockage of
17   air when bioteen is present in the mask and also a substantial blockage of air passage
18   when egg whites are applied to the mask. Dr. Kagan's report is attached hereto along
19   with his CV. Bioteen and egg whites are acceptable substitutes for human blood and
20   nasal excretions. **(Plaintiff Ex.6)**

21       Emotional and/or mental instability is a factor that must be considered in
22   determining the reasonableness of the force employed. *Luchtel v. Hagemann*, 623
23   F.3d. 975, 980 (Ninth Cir. 2010), *Drummond,* 343 F.3d. 1052, 1058 (Ninth Cir. 2003). It
24   may also be appropriate to consider the parties "relative culpability" i.e. which party
25   created the dangerous situation and which party is more innocent may also be
26   considered, *Espinoza v. City and County of San Francisco,*  598 F.3d. 528, 537 (Ninth
27   Cir. 2010).

28

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS
MOTION FOR SUMMARY JUDGMENT

In excessive force cases in which death results, the Ninth Circuit has cautioned that Summary Judgment is to be granted sparingly and that the entirety of the evidence is to be carefully examined because often times the only surviving witness to the use of force are defendants. *Gonzalez v. City of Anaheim,* 747 F.3d. 789, at 794, 795.

//

//

//

## D. SURVIVORS RIGHTS

Plaintiffs surviving parents are entitled to bring an action under 42 U.S.C § 1983, Constitutional violations. In *Chaudhry v. City of Los Angeles,* 751 F.3d. 1096, 1102 -1105 (Ninth Cir. 2014) cert denied 135 S.Ct. 295 (2014). A defendant Police Office shot and killed *Chaudhry.* The court held, California Survival Law prohibiting recovering for pre-death pain and suffering is inconsistent with Section 1983 Policies of Compensation and Deterrence in cases in which death was caused by defendants violation of Federal Law; practical effect of this State Law is to reduce and often eliminate compensatory damages for survivors of people killed by violations of Federal Law, with the perverse effect of making it more economically advantageous for defendants to kill rather than injure a victim. The Ninth Circuit held that California's Survivorship law, which excludes damages for the deceased pain and suffering, is inconsistent with the policies of § 1983.

Thus Section 1983 does not require deference to a State Survival Statute that would bar or limit the remedies available under Section 1983 for unconstitutional conduct that causes death. *McFadden v. Sanchez,* 710 F.2d. 907, 911 (Second Cir. 1983) Cert denied 464 U.S. 961 (1983). In *Felder v. Kaycee,* 487 U.S. 131, 142 (1988) the court in dictum stated that State statutory limits on monetary recovery are pre-empted by Section 1983, because "partial immunities inconsistent with Section 1983 must yield to the Federal rights". Several other Ninth Circuit cases shed light upon the assertion that the parents of Matthew Robinson have no rights under Federal Law.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFEDANTS
MOTION FOR SUMMARY JUDGMENT

1   *Moreland v. Las Vegas Metropolitan Police Department,* 159 F.3d. 365, 371 (Ninth Cir.

2   1998) held "Substantive due process claim may be asserted by both parents and

3   children of a person killed by law enforcement officers". *Byrd v. Guess,* 137 F. 3d. 1126

4   (Ninth Cir. 1998) cert denied 525 U.S. 963 (1998), held that deadly force, although a

5   survival claim was governed by Fourth Amendment objective reasonableness test,

6   surviving mother and wife' wrongful claims were governed by Due Process deliberate

7   indifference standard.  In *Kelson v. City of Springfield,* 767 F.2d. 651 (Ninth Cir. 1985),

8   the court held that parents may assert Constitutional claim based upon a school's

9   failure to prevent their son from committing suicide. *Johnson v. Bay Area Rapid Transit*

10   *District,* 724 F.3d. 1159, 1168-1170 (Ninth Cir. 2013), recognized a parents

11   Constitutional right to companionship with the son, which may exist regardless of the

12   child's age. *Corrs v. Anne Lamire v. California Department of Corrections and*

13   *Rehabilitation,* 726 F.3d. 1062, 1075 (Ninth Cir. 2013) Held that the claim by parent's

14   and daughter of an inmate who committed suicide, that "parents and children may

15   assert Fourteenth Amendment substantive Due Process claims, if they are deprived of

16   their liberty interest in the companionship and society of their child or parent through

17   official conduct".

18

19   **E. WOODS IS NOT ENTITLED TO QUALIFY IMMUNITY**

20       Defendant Woods statement that Robinson was "reaching for my gun" at the

21   same time as Woods was holding Robinson in a "bear hug" is patently unbelievable. In

22   addition, Woods claims that Robinson's left arm was pinned to Robinson's side

23   because of Woods "bear hug". When asked about the right arm, Woods seemed

24   uncertain and thinks Robinson, was trying to get his gun.

25       In the investigative interview of Woods on July 29, 2014 by Sgt. Bokovich, Lt.

26   Hestin, and Attorney Nicole Valentine in the internal affairs investigation No. 14-26,

27   Woods states "Yeah, and, uh, and I realized in my hand, in my right hand is my OC

28   canister that I had initially and never got to secured it anywhere and, uhm, so, and he

14

starting to reach down into where my gun is at, and so I started to hit him in the face with my, uhm, OC canister, with the top of my OC canister, and I hit numerous times. I am not exactly sure how many times as hard uhm, and fast as I could, and my intention to distract him from reaching down into my gun and equipment area and uh, so that it would draw his attention to his face and it did." On Page 15; Line 21 Woods described himself "covered with blood". Elsewhere however, Woods testified on Page 18; Line 21 of his deposition: "I couldn't get to my firearm" and in the next answer he stated "after I struck him with the OC canister, uhm, he, his hand came out from under, underneath him and my right area right where there to his face and, uh, and so, and then as soon as that hand came up unto his face, I was able to roll out from underneath him, on top of him."

It's clear from the interview testimony of Woods that he is internally inconsistent with his testimony. He describes Robinson as reaching into the vicinity of his gun and then later describing that his right arm is underneath his body, a contradiction of the last statement that the hand is underneath the body is consistent of that of the witnesses who stated they never observed Robinson reaching for Woods side arm. (PSF#18)

Defendant Hollemon a Redding Police Officer, and the other a civilian named Schneider, both testified under oath, that neither of them saw Robinson reaching for Woods side arm. Defendants argue that "reaching for the gun" justifies the excessive force applied to Robinsons face. Without a finding of fact that Robinson reached for Woods gun, which was secured in a safety holster, Woods is liable for applying excessive force to Robinson's face. When the court considers a Motion for Summary Judgment, the facts must be reviewed in a light most favorable to the Plaintiff. *Margolis v. Ryan,* 140 F.3d. 850, 852 (Ninth Cir. 1998). The standard also applies to a determination of the Defendants entitlement to qualified immunity as a matter of law. *Moran v. State of Washington,* 147 F.3d. 839, 844 (Ninth Cir. 1998).

Defendant Woods attempts to build his issue of, qualified immunity on the foundation of the disputed reaching for the gun testimony. The Defendant cites no authority for the proposition that Woods testimony standing alone is subject to a fact finding by the court sitting in judgment on a motion for Summary Judgment when those facts are disputed.

//

//

## F. ROBINSON DISCOVERED TO NOT BE BREATHING

In the investigative narrative prepared by Justin Duval Officer Serial No.153, Officer Duval stated "When I arrived, the Defendant was face down on the concrete near the entrance of Restpadd Psychiatric Health Facility. He was handcuffed and being held down by officers. I immediately noted that Defendant was bleeding from his face and he was lifting his head back and attempting to roll over. I placed my right knee on the Defendant's upper left back. He continued to lift his head in attempt to roll over. Additional officers arrived on scene and after several minutes, leg restraints were put on the Defendant. Corporal Smyrnos also put a spit hood over the Defendant's head. An ambulance had also been dispatched to the location to transport the Defendant to the hospital. Defendant stopped resisting after the leg restraints were put on. We rolled the Defendant onto his right side so we could better monitor his breathing."

Also in the investigative narrative Officer Justin Duval states, "I could clearly see his chest rising and falling as he was breathing. I noted no indication that the Defendant was having any difficulty breathing." **(Plaintiff's Ex.8)**

In the Investigative narrative prepared by Abigail D. Dodds Officer Serial No. 139, Officer Dodds stated, "I asked out-loud if the subject was still breathing. I could see a slight rise and fall of his chest but it appeared shallow. We moved the subject on his side and into the recovery position." Officer Dodds does not describe observations

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS
MOTION FOR SUMMARY JUDGMENT

about decedent stopped breathing, but only that he had difficulty breathing. **(Plaintiff's Ex.9)**

In the investigative narrative prepared by Chris Smyrnos Officer Serial No. 324, Officer Smyrnos stated:

//

//

//

"I also asked for someone to bring a spit hood in order to protect us from D/Robinson's bloody spit. A short time later I was handed a spit hood by one of the other officers on scene. D/Robinson's head was very difficult to control as it was bloody and sweaty. I was able to get the spit hood onto the top of D/Robinson's head and then lifted his head slightly from the ground to get the fabric around the front of his face. Once I did so, I ensured that the spit hood was in the proper position over D/Robinson's head… I noticed that D/Robinson stopped yelling and his active resistance subsided." **(Plaintiff Ex.10)**

"I checked to make sure D/Robinson was still breathing and he was. I continued to monitor D/Robinson and noticed that his breathing was becoming slightly labored and his breaths were taking longer between each one. Another officer checked D/Robinson's pulse and told me he still had one." **(Plaintiff Ex.10)**

I instructed Officer Duval to roll D/Robinson onto his left side to place him in a recovery position. This position is where D/Robinson was placed on his side while bending his legs toward his waist. This position is designed to assist an unconscious subject with their breathing. I again checked D/Robinson's breathing and noticed a distinct gurgling noise coming from his airway….A short time later, it appeared that D/Robinson had stopped breathing"

In footnote 8 in Defendants Memorandum Points and Authorities Defendant cites testimony from Hollemon as "Minor to moderate bleeding from an abrasion …the only lacerations noted were minor cuts to the side of his face". Plaintiff has attached photographs of the blood pools that were left at the scene photographed by the Redding Police Department. **(Plaintiff's Ex.5)** Autopsy photographs show the extreme

17

1  depth of the wounds on Robinson's head next to his eye and the autopsy description

2  that the wound extended through the skin and into the muscle tissue above the eye,

3  hardly a description of minor cuts. Furthermore, the improvised impact weapon used by

4  Defendant Woods was struck against Robinsons head with all the force that a Six-foot,

5  270lb Defendant Woods could exert against Robinsons head.

6      As stated in the much cited Ninth Circuit case of, *Deorle,* 272 F.3d. 1272, at 1282,:

7

8  //

9  //

10      "The problems posed by, and thus the tactics to be employed against, an
        unarmed, emotionally distraught individual who is creating a disturbance

11      or resisting arrest are ordinarily different from those involved in law
        enforcement efforts to subdue an armed and dangerous criminal who has

12      recently committed a serious offense. In the former instance, increasing
        the use of force may, in some circumstances at least, exacerbate the

13      situation; in the latter, a heightened use of less-than-lethal force will
        usually be helpful in bringing a dangerous situation to a swift end. In the

14      case of mentally unbalanced persons, the use of officers and others
        trained in the art of counseling is ordinarily advisable, where feasible, and

15      may provide the best means of ending a crisis. See *Alexander,* 20 F.3d. at

16      1366 (holding that the police used excessive force, considering all the
        circumstances, in "storming the house of a man whom they knew to be a

17      mentally ill ... recluse who had threatened to shoot anybody who

18      entered"). Even when an emotionally disturbed individual is "acting out"
        and inviting officers to use deadly force to subdue him, the governmental

19      interest in using such force is diminished by the fact that the officers are
        confronted, not with a person who has committed a serious crime against

20      others, but with a mentally ill individual. We do not adopt a per se rule

21      establishing two different classifications of suspects: mentally disabled
        persons and serious criminals. Instead, we emphasize that where it is or

22      should be apparent to the officers that the individual involved is
        emotionally disturbed, that is a factor that must be considered in

23      determining, under *Graham,* the reasonableness of the force employed".

24

25      It is difficult to conceive all the Defendants argument for qualified immunity in

26  light of the actions of Woods toward mental patient Robinson. Robinson committed no

27  crime and both officers admitted such in their depositions. The use of an OC canister to

28  beat a mental patient's face that cut down into the muscle is similar to that of using

18

brass knuckles which the law has previously forbidden. In *Deorle, Id.* at 1285-1286, the

court resolves the issues presented by the Defendant here:

> "Although there is no prior case prohibiting the use of this specific
> type of force in precisely the circumstances here involved, that is
> insufficient to entitle *Rutherford,* 272 F.3d.1272 to qualified immunity:
> notwithstanding the absence of direct precedent, the law may be, as it was
> here, clearly established. See *Anderson v. Creighton,* 483 U.S. 635, 640,
> 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (rejecting the notion that officer
> liability cannot exist "unless the very action in question has previously
> been held unlawful"). Otherwise, officers would escape responsibility for
> the most egregious forms of conduct simply because there was no case
> on all fours prohibiting that particular manifestation of unconstitutional
> conduct. When " 'the defendant ['s] conduct is so patently violated of the
> constitutional right that reasonable officials would know without guidance
> from the courts' that the action was unconstitutional, closely analogous
> pre-existing case law is not required to show that the law is clearly
> established." *Mendoza v. Block,* 27 F.3d. 1357, 1361 (Ninth Cir.
> 1994)(quoting *Casteel v. Pieschek,* 3 F.3d. 1050, 1053, (Seventh
> Cir.1993)). This is such a case. No reasonable officer could have believed
> that Rutherford's action in shooting Deorle with the "less lethal" lead-filled
> beanbag round was appropriate or lawful… We have held that "an officer
> is not entitled to qualify immunity on the grounds that the law is not clearly
> established every time a novel method is used to inflict injury" *Mendoza,*
> 27 F.3d. at 1362. Given all the circumstances, the error in judgment, such
> as it was, does not constitute a "reasonable mistake" of fact or law on
> Rutherford's part. Viewing the facts in the light most favorable to the
> plaintiff, Rutherford was not entitled to qualified immunity for his use of
> excessive force."

In support of its contention that the Defendants acted lawfully, the Defendants

cite *Billington v. Smith,* 292 F.3d. 1177, 1185 (Ninth Cir. 2002) (*overruled on other*

*grounds County of Los Angeles v. Mendez,* 137 S.Ct. 1539 (2017)). In *Billington,*

Hennessey was driving a vehicle in a reckless matter at night, cutting other cars off,

speeding, driving without lights, and crashing into a curb committing hit and run

offenses in the presence of law enforcement officers. Hennessey was found to be

under the influence of alcohol with a .285 percent blood alcohol level. Hennessey

assaulted the officer by grabbing him by the throat and his tie, and swinging at the

arresting officer.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFEDANTS
MOTION FOR SUMMARY JUDGMENT

The fact is in *Billington,* are opposite to the fact's here "Detective Smith tried to back away from Hennessey and fend off his blows and kicks, but Hennessey charged him, held him in a bear hug, and grabbed his gun by the barrel. Hennessey landed a solid blow to Detective Smith's head, cutting him, knocking his glasses off, and forcing him back, out of the glare of the police car's headlights and into the surrounding darkness." Clearly a criminal Defendant was the aggressor and was assaulting the police officer in *Billington.* In *Billington,* the court stated "We consider the circumstances, including whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." Hennessey actively, violently, and successfully resisted arrest and physically attacked Detective Smith and tried to turn Smith's gun against him. No one who saw the fight disputes that Hennessey was the aggressor, and that he kept beating Detective Smith even when Detective Smith tried to retreat. Hennessey was trying to get the detective's gun, and he was getting the upper hand. Hennessey posed an imminent threat of injury or death; indeed, the threat of injury had already been realized by Hennessey's blows and kicks."

Defense also relies on <u>*Johnson v. Cortes,*</u> 2011 WL 445921 (N.D. Cal. 2011), an unopposed motion for Summary Judgment by the Defense. The essential difference in *Johnson v. Cortes* from the case at bench is, that the facts were opposite of those of our case. The officers were restrained in using any force and the Plaintiff was the aggressor. The Johnson court did not have the spit mask facts developed in Robinson.

In <u>*Kingsley v. Hendrickson,*</u> 135 S.Ct. 2466, the court discussed a case entitled *Johnson v. Glick,* 481 F.2d. 1028 (C.A.2 1973) in which the *Johnson* court laid out factors in determining whether the intentional use of force crosses the Constitutional line a court should look: "to such factors as: 1) the need for the application of force, 2) the relationship between the need and the amount of force that was used, 3) the extent of injury inflicted; and 4) whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

The *Kingsley* court then observed that "This statement does not suggest that the fourth factor (malicious and sadistic purpose to cause harm) is a *necessary* condition for liability. To the contrary, the words "such ... as" make clear that the four factors provide examples of some considerations, among others, that might help show that the use of force was excessive."

Here, Defendant Woods, struck Plaintiff decedent in the head, and in the face with the full force of his musculature as hard and as fast as he could. This indicates less of a distraction and more of a malicious and sadistic attempt to punish a mentally-ill subject for his behavior, which irritated and inconvenience the officer.

In *Bel-Montez v. City of Stockton,* 2017 WL2633412 (E.D.Cal.2017), defendant who was high on PCP and arrested for public intoxication became agitated and resistive and was carefully and reasonably restrained  by police officers, and suddenly went limp. The medical examiner performed an autopsy on Garcia, and determined the cause of death to be cardiac arrhythmia brought on by hypertrophic cardiomyopathy and a high level of ACP in his system, which aggravated his underlying heart disease causing cardiac arrest.

### IV. MUNICIPAL LIABILITY (MONELL LIABILITY)

In *Monell v. Department of Social Services,* 436 U.S. 658 (1978) the court found that the Doctrine of Respondeat Superior does not apply to Municipalities in Section 1983 cases. The analysis urge by the Monell and subsequent cases was discussed by the Fifth circuit as a fault-responsibility issue in *Gonzalez v. Ysleta Independent School District ,* 996 F.2d. 745 (Fifth Cir. 1993). In *Gonzalez* the Plaintiff an elementary school student, had been sexually molested by her first grade teacher. The Plaintiff argued that Section 1983 liability should be imposed upon the School District for the depravation of her Constitutional rights because the district's "Board of Trustees had elected to keep the teacher in the classroom in the face of similar allegations of sexual abuse two years earlier". *Id* at *746.* Despite these allegations, The Board transferred

21

the teacher from his prior school to the Plaintiff's school, rather than relieve him of his teaching responsibilities altogether.

Because the board of Trustees was the school district final policy maker, its "conscious decision to transfer" the teacher rather than take other action "plainly constituted a policy attributable to the school district." *Id* at 754. The critical issue is whether, as Plaintiff urged, the Board's decision was sufficient to subject the School District to liability, or as the School District argued, it could not be found liable unless it's decision reflected "deliberate indifference". In *Larenz v. City of Los Angeles,* 946 F.2d. 630 (Ninth Cir. 1991) the Ninth circuit found the Police Commissioners failure to take remedial action following Constitutional violations by police officers supported a finding that the city had a custom or policy of condoning the use of excessive force. In *McRorie v. Shimoda¸* 795 F.2d 780 (Ninth Cir. 1986) an action for damages arising for numerous alleged abuses during a prison shake down, the Ninth Circuit stated that "Policy or custom may be inferred if, after the shakedown, the prison officials took no steps to reprimand or discharge the guards, or if they otherwise failed to admit the guards' conduct was in error." *Id* at 784.

Here in Robinson, the only resulting municipal action regarding the incident was that Officer Woods received a letter of reprimand for using vulgar language and Officer Hollemon was declared Officer of the Year.

## IV. CONCLUSION

No one is contending that Matthew Robinson committed any crime leading to his encounter with the Defendant Officers. Nor is anyone contending that, had Matthew stayed home that day he would have died of natural causes. Defendant's contend Matthew died of a controversial cause known as "excited delirium". Such a contention does not constitute an escape from liability. Torturing a mentally disabled person with verbal and physical assault, hog tying him then placing a hood over his head all of which was against officer training is a formula for tragedy. No amount of parsing can

22

avoid the fact that, but for the unlawful and unconstitutional treatment of Matthew at the hands of the Redding defendant's, Matthew would be alive today. Matthew's physical exam at Enloe Hospital in Chico cleared him for transport.

Matthew Robinson was not a criminal. He was a mental patient. Yet the Redding police referred to him in their reports as "the subject" or "the defendant" or simply as "D". Matthew was treated with provocation, disrespect and excessive force. Defendant's Motion lacks merit and must be denied.

Dated: 8 - 25_____, 2017    THE LAW OFFICE OF LARRY L. BAUMBACH

_____
LARRY L. BAUMBACH

23