UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KATHERINE ROBINSON, and
WILLIAM ROBINSON;

  Plaintiffs,

  v.

COUNTY OF SHASTA, et al.,[1]

  Defendants.

No. 2:14-cv-02910-KJM-KJN

ORDER

Matthew Robinson died after a violent police encounter in July 2014.[2] Matthew's parents sue the City of Redding, the Redding Police Chief and Redding Police officers M. Woods, A. Hollemon, T. Renault and C. Smyrnos, alleging defendants violated their son's civil

---

[1] The court has previously cautioned that unless plaintiffs show good cause for not identifying the "doe defendants" within 120 days of filing the complaint, the court may dismiss them. ECF No. 20 at 1 n.1 (May 4, 2015 Order); ECF No. 36 at 1 n.1 (Sept. 14, 2015 order). More than four years have passed since plaintiffs filed their initial complaint, yet plaintiffs have neither identified the doe defendants nor shown good cause for not doing so. The doe defendants are hereby DISMISSED.

[2] The court uses Matthew Robinson's first name to avoid confusion with the named plaintiffs, Matthew's parents, Katherine Robinson and William Robinson.

1

rights.[3]  Defendants move for summary judgment.  Mot., ECF No. 66.  Plaintiffs oppose, Opp'n, ECF No. 76, and defendants filed a reply, Reply, ECF No. 77.  The court heard the motion on September 8, 2017.  ECF No. 78.  As explained below, after careful consideration in this difficult case, the court GRANTS in part and DENIES in part defendants' summary judgment motion.

I.      BACKGROUND

        A.      Factual Disputes and Evidentiary Objections

                Unless stated otherwise, the following facts are undisputed.  Statement of Facts ("SUF"), ECF No. 66-1.  Although plaintiffs have filed a separate statement of undisputed facts ("PF"), ECF No. 76-1, to maximize clarity the court cites to defendants' statement of facts, but references plaintiffs' responses when noting a genuine factual dispute.  *See* Pls.' Response, ECF No. 76-2.  Where genuine disputes exist, the court draws reasonable inferences in plaintiffs' favor.  *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014).

        B.      Factual Background

                In July 2014, Matthew Robinson experienced mental health issues that led to a violent encounter with Redding police officers.  Matthew died one week later.

                1.      Matthew's Transfer to a Locked Facility

                On July 19, 2014, Merit Medi-Trans driver Darren Schneider picked up 33-year-old Matthew from Enloe Hospital in Chico, California to take him to Restpadd Hospital, a locked mental health facility in Redding, California.  SUF 1.  Matthew was transported to Restpadd under California Welfare & Institutions Code § 5150, with "section 5150 patients" referring to individuals who are involuntary committed based on their mental health status.  SUF 1; *see also* Cal. Welf. & Inst. Code § 5150(a) (authorizing temporary commitment "[w]hen a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely

---

        [3] On September 14, 2015, in resolving the motion to dismiss plaintiffs' third amended complaint, the court dismissed with leave to amend plaintiffs' sole remaining claim against defendant Shasta County.  *See* ECF No. 36 at 10.  Plaintiffs named Shasta County as a defendant in their operative fourth amended complaint, ECF No. 57, but assert claims only against the "Redding defendants."

2

1   disabled"). Schneider transported Matthew in a converted police car with a metal cage separating

2   the backseat from the front. SUF 3.

3            Matthew was calm for the first part of the drive. Schneider Dep., Defs.' Ex. A(1),

4   ECF No. 67, 41:2−7; Schneider Report, Pls.' Ex. 1, ECF No. 76-3,[4] at 5. As Schneider neared

5   Restpadd, Matthew became vocal and restless, telling Schneider to slow down because people

6   were after them. SUF 7. Matthew was agitated when he and Schneider arrived a Restpadd, so

7   rather than try to get Matthew into the facility himself, Schneider rang Restpadd's buzzer for

8   assistance. SUF 9−10. Two Restpadd employees came to the car, unsuccessfully attempted to

9   calm Matthew by speaking to him through the car's window, then refused to accept Matthew

10  because of his agitated state. SUF 10−11. A Restpadd employee told Schneider that Matthew

11  needed to sit unrestrained and cooperative for several hours before Restpadd would allow him to

12  enter the facility. SUF 11. Matthew had taken his shirt off, smashed a light fixture in the car, torn

13  a pillow apart, punched and kicked the cage between him and Schneider, and hit his seat belt

14  against the back passenger's window. SUF 8.

15                      2.    Contacting Redding Police

16           Unable to deliver Matthew to Restpadd, Schneider called a crisis worker at Butte

17  County Mental Health, who advised Schneider to call the Redding police to take Matthew to a

18  hospital. SUF 12. Schneider called the Redding police and explained he had a Butte County

19  § 5150 patient that Restpadd had refused and he had been told to call the police to pick up

20  Matthew and take him to a hospital to be medicated or calmed down. SUF 15. Officer Woods

21  responded to the call. SUF 16. Schneider told Woods that Matthew had broken a plastic light

22  that could possibly use to hurt himself or others. SUF 16; Pls.' Resp. to SUF 16; Schneider

23

24

25  ───────────────────────
          [4] Rather than providing each exhibit as an individual document, all of plaintiffs' exhibits
26  were filed at ECF No. 76-3. Accordingly, the court omits further reference to ECF No. 76-3 in
    identifying plaintiffs' exhibits and cites only to the ECF page number, or deposition pages and
27  lines when possible.

28
                                            3

1    Incident Report,[5] ECF No. 67 at 160−202, at 190 (indicating he "wasn't terribly worried about

2    [Matthew hurting himself] cause [sic] it was a piece of plastic").

3            Schneider testified that before other officers arrived, Woods appeared agitated and

4    told Schneider this was "a Bunch of Butte County bullshit being dumped in our lap."  Schneider

5    Dep. 86:4−10; Schneider Report at 7;[6] Woods Dep., Defs.' Ex. A(2), ECF No. 67-1, 78:6−22

6    (stating he does not remember making this statement but does not deny making it); *see also*

7    Woods Dep. 139:9−22 (admitting he made statement indicating there was "patient dumping" in

8    Redding and "they got this guy [referring to Matthew] that's a nut and they're just going to let

9    him go and now we're going to have to deal with him"); Brindley Dep., Defs.' Ex. A(4), ECF No.

10   67-3, 22:14-21 ("[W]e had been called to [Restpadd's] facility in my mind more often than we

11   should since they have a mental health facility, and I was frustrated that we were at their facility

12   again, and my officers were put in a position where they had to struggle with somebody.  And my

13   perception at the time was that they were not doing enough to take care of their patients.").

14           Woods heard Matthew "banging around" in the back of Schneider's car.  SUF 18.

15   Woods leaned through the front passenger window of Schneider's car and told Matthew "to calm

16   down or [Woods] was gonna bring a bunch of police officers over" to "kick [Matthew's] fucking

17   ass."  SUF 18−20; Woods Dep. 140:5−22 (admitting he made this statement), Schneider Dep.

18   83:7−84:9 (confirming he reviewed video capturing Woods telling Matthew words to the effect,

19   "knock it off or I'm going to get a bunch of officers here and beat your ass," though he had not

20   overheard that interaction on the scene).  Matthew stopped "banging around."  SUF 21.

21           Officer Hollemon arrived after Woods.  SUF 22.  Woods and Hollemon

22   approached Schneider's car and Matthew again became agitated, at which point Woods showed

23   Matthew his can of pepper spray and threatened to use it if Matthew did not calm down.  SUF 24.

24   _____

25           [5] The court notes Schneider Incident Report, attached to Schneider's deposition, is distinct
     from the Schneider Report provided in plaintiffs' exhibits.

26

27           [6] In his deposition, Schneider could not recall "exactly when" Woods made this statement,
     but his report indicates Woods made this statement after he first arrived and before he spoke to
     Matthew through the front passenger window of Schneider's car.

28

                                                      4

Matthew responded by complying with the officers' commands to put his hands on his head and get out of the car. SUF 25. Woods and Hollemon each grabbed one of Matthew's wrists as he stepped out. SUF 26. Schneider indicated that Matthew did not appear to have the plastic from the broken light when he exited the car, as his hands were on his head and he had taken his pants off. Schneider Incident Report at 190. Matthew was initially cooperative, but as Woods started putting his pepper spray canister away, Matthew freed one of his hands. SUF 27. There is a factual dispute as to what happened next. *Compare* SUF 27 (citing Woods' deposition), *with* Pls.' Response to SUF 27 (citing Hollemon's deposition). Woods testified that Matthew freed his hand, pulled away from Hollemon, punched Hollemon in the face or upper body and began to lunge away from the car. Woods Dep. 96:12−18, 97:4−14, 98:9−13. Hollemon testified that Matthew broke from Woods' grip, used his free hand to slap Hollemon's elbow with an open hand, hard enough that Hollemon felt the impact but not hard enough to injure or move him, and Hollemon maintained his grip on Matthew until Woods placed him in a bear hug. Hollemon Dep., Defs.' Ex. A(3), ECF No. 67-2, 65:10−66:12, 78:16−79:13.

### 3. Use of Force

Seconds after Matthew slapped Hollemon, Woods put Matthew in a "bear hug[]" or "tackled him essentially," with Woods' chest to Matthew's back and Woods' arms around Matthew's upper arms; Woods and Matthew then went to the ground, with Woods landing on his back and Matthew restrained on top of him. SUF 28; Woods Dep. 98:10−16, 99:25−102:18. What happened next is contested. Woods testified he could "feel [Matthew] pulling on [his holstered gun]" as Matthew lay on top of him. SUF 29; Woods Dep. 107:4−19. Schneider testified he never saw Matthew reach for Woods' gun. Schneider Dep. 122:2−4. Hollemon testified he never saw Matthew's hands free or near Woods' gun, and "it would have been difficult for [Matthew to attempt to strike Woods] . . . due to the fact that Woods had [Matthew's] upper arms in a bear hug." Hollemon Dep. 82:16−25, 102:25−103:5; *see also* Pls.' Resp. to SUF 29 (arguing "No disclosure has been made of any fingerprints or DNA evidence on Woods [sic] gun indicating Matthew had contact with it" and "Woods [sic] gun was on his right side and Matthew is left handed"). Woods then struck Matthew in the face three to five times "as hard and

as [he] could" with his pepper spray canister.  Woods Dep. 104:20−105:7; SUF 30 (describing

Woods' strikes as "distraction strike[s]").  As Matthew put his hand to his face, Woods rolled out

from underneath Matthew and pinned him to the ground by lying on top of him while Hollemon

held Matthew's legs.  SUF 31.  As Woods called for backup, Matthew screamed and pushed

against the ground.  SUF 32.

When Officers Smyrnos and Renault arrived as backup, Woods, Hollemon,

Smyrnos and Renault handcuffed Matthew's hands behind his back.  SUF 33; Hollemon Dep.

56:19−22.  Woods returned to his car.  *See* SUF 34.  Matthew continued to resist officers'

attempts to restrain him.  SUF 37.  Those attempts included Hollemon trying to hold Matthew's

legs in various positions with his hands and his expandable baton as Matthew tried to push

Hollemon away with his legs, sometimes face down, sometimes on his side.  SUF 37−38;

Hollemon Dep. 57:6−17, 58:13−59:13.  Another officer relieved Hollemon after eight minutes of

attempting to restrain Matthew.  SUF 39.

During this struggle, as Matthew yelled and screamed, Smyrnos noticed blood and

saliva projecting from Matthew's face.  SUF 41; *see* Pls.' Resp. to SUF 41 (noting neither

Hollemon, Woods nor Smyrnos saw Matthew intentionally spit or attempt to spit).  Smyrnos

placed a "spit hood" over Matthew's head to prevent potential contamination from Matthew's

blood and saliva.  SUF 41.  Smyrnos testified that after he applied the spit hood, he monitored

Matthew's breathing "throughout this time."  Smyrnos Dep., Defs.' Ex. A(5), ECF No. 67-4,

21:7−24, 26:17−25 (testifying he monitored Matthew's breathing the entire time the spit mask

was on by listening to Matthew breathing); *see* SUF 42 (citing only what appears to be a policy,

Defs.' Ex. A(7), ECF No. 67-6, at 2 ("The prisoner shall be monitored while the net hood is

worn.")).  Plaintiffs dispute that Smyrnos continuously monitored Matthew's breathing, noting

Smyrnos also testified he had "disengaged from [Matthew] to try to retrieve leg restraints" from

his patrol car, though it is unclear whether this occurred before or after the spit hood was applied.

*See* Pls.' Resp. to SUF 42 (citing Smyrnos Dep. 19:7−13); *see also* Smyrnos Report, Pls.' Ex. 10

at 101−02 (indicating Smyrnos checked his patrol car for restraints before applying the spit

hood).  Plaintiffs also note Officer Brindley testified that when he arrived on the scene, Matthew

was wearing the spit mask and, at some point thereafter, "[Brindell] believe[d] . . . . Officer Smyrnos was down at [Matthew's] feet and was trying to control his feet" and "Smyrnos had [Matthew's] feet kind of straddling the back behind his feet with his feet towards his rear end." Pls.' Resp. to SUF 42; Brindley Dep. at 9:15−20, 28:12−14, 30:11−21, 45:5−7.

Smyrnos testified that as the officers attempted to secure leg restraints on Matthew, his "active resistance had subsided." *See* SUF 45; Smyrnos Dep. 19:25−20:3, 22:16−22; Smyrnos Report at 102. Smyrnos then noticed Matthew's breathing becoming labored and noticed he was taking longer between each breath. SUF 43. After another officer confirmed Matthew still had a pulse, the officers rolled him onto his side. SUF 44. An officer then announced Matthew had stopped breathing. SUF 45; *see also* Smyrnos Dep. 20:11−15 (testifying one to two minutes after Matthew stopped yelling and resisting, an officer announced he wasn't breathing).[7]

The officers removed the spit hood. SUF 46; *see also* Smyrnos Dep. 25:10−17 (testifying he could not "remember exactly when" the officers removed the spit mask but after doing so, he could hear Matthew "gurgling"). Officers then performed cardiopulmonary resuscitation until an emergency medical team arrived. SUF 46. Matthew suffered two fractured ribs, a fractured nose and cuts to his scalp and muscles in his forehead. PF 60. He died eight days later at Mercy Medical Center in Redding. SUF 47 (claiming the cause of death was "excited delirium" and citing County Death Verdict, Defs.' Ex. A(9), ECF No. 68[8]); Pls.' Resp. to

---

[7] Among other citations, defendants rely on "Exh. A(13) at pp. 006-007" as the source for SUF 45, 46. No such exhibit was provided to the court. It appears to the court that defendants may have intended to cite to their copy of the Smyrnos Report, included after Smyrnos' deposition, ECF No. 67-4 at 81−85.

[8] This exhibit, among others provided by defendants, is largely illegible. A portion of defendants' Ex. A(9) could be read to identify "[e]xcited delirium" as the cause of death, though the word or words immediately following are entirely illegible. *See* Defs.' Ex. A(9) at 006. Nonetheless, plaintiffs' Ex. 3 at 19 is a clear copy of the verdict of death and indicates the death was caused by "excited delirium / 8 days."

SUF 47,[9] Martinelli Report, Pls.' Ex. 7 at 81−83 (disputing excited delirium finding and concluding Matthew died from acute cardiac failure caused by "head blows . . . which would have impaired his breathing; and then [] suffocating, inside the blood and sputum saturated spit mask . . . .), Raven Dep., Pls.' Ex. 2, 24:5−28:23 (expressing doubt as to excited delirium determination and coroner's methods).

C.     Procedural Background

Matthew's parents bring this civil rights action individually and as co-administrators of Matthew's estate. Fourth Am. Compl. (Compl.), ECF No. 57, ¶ 1. The remaining defendants are the City of Redding ("City"); Redding Police Officers Woods, Hollemon, Renault and Smyrnos; and Police Chief Robert Paoletti. Id. ¶¶ 3−7, 12.

Plaintiffs bring several federal claims against the individual officers and the City under 42 U.S.C. § 1983,[10] contending the officers used excessive force and violated Matthew's due process and equal protection guarantees. See Compl. ¶¶ 18−19, 23, 32−41. Plaintiffs also raise state law claims, including a California civil rights claim for disability-based violence and a negligent hiring claim. Id. ¶¶ 28, 42−46, 47−53.

---

[9] As elsewhere, plaintiffs dispute this fact by referring to their own statement of facts, which includes an erroneous citation. See Pls.' Resp. to SUF 47 (citing plaintiffs' expert's report and directing the court to "PSF #36, 37," though plaintiff's facts 36 and 37 are not related to SUF 47 or plaintiffs' expert's report). The court independently located plaintiffs' expert's report in plaintiffs' exhibits.

[10] Entitled "Civil action for deprivation of rights," § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

8

II.    SUMMARY JUDGMENT STANDARD

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The movant bears the initial burden of showing "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the non-movant to show "there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, the parties can either cite evidence supporting their own position, or show the other side's position is either unsupportable or devoid of any genuine dispute. Fed. R. Civ. P. 56(c)(1). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247−48; *see also Matsushita*, 475 U.S. at 586 (non-movant must show more than "some metaphysical doubt as to the material facts").

In deciding summary judgment, courts draw all inferences and view all evidence in the non-movant's favor. *Matsushita*, 475 U.S. at 587−88. "Where the record taken as a whole could not lead a rational trier of fact to find for the [non-movant], there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Because courts should act "with caution in granting summary judgment," courts may "deny summary judgment in a case where there is reason to believe the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255. Trial may be necessary, for instance, "if the judge has doubt as to the wisdom of terminating the case before trial," *Gen. Signal Corp. v. MCI Telecomms. Corp.*, 66 F.3d 1500, 1507 (9th Cir. 1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)). This is true "even in the absence of a factual dispute." *Rheumatology Diagnostics Lab., Inc v. Aetna, Inc.*, No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting *Black*, 22 F.3d at 572).

III.     <u>ANALYSIS</u>

Plaintiffs bring § 1983 claims both on their own behalf and on behalf of Matthew's estate. To prevail on a § 1983 claim, plaintiffs must show that while acting under color of state law, the officers violated a federal right. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). Plaintiffs contend Woods, Hollemon, Smyrnos and Renault violated several federal rights, including the Fourth and Fourteenth Amendment right to be free from unlawful seizures; Fifth and Fourteenth Amendment rights to life and liberty; and rights under the Equal Protection Clause.[11] All but the equal protection claim are based on the officers' alleged use of excessive force. Plaintiffs also contend defendants violated multiple state laws. Defendants argue plaintiffs' rights were not violated and the officers are immune from suit and move for summary judgment on several of plaintiffs' state law claims. The court addresses defendants' arguments below.

A.     <u>Equal Protection Claim</u>

The Equal Protection Clause commands that "no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citation omitted). A § 1983 equal protection claim requires proof that "defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (citation omitted). Plaintiffs here do not specify a "class," but the allegations and facts suggest plaintiffs pursue this claim, if at all, based on Matthew's status as a person with a disability. *See, e.g.*, Compl. ¶ 9 (describing Matthew's mental health crisis on day at issue), *id.* ¶¶ 18–19 (alleging defendants were aware of Matthew's mental health status and knew he posed no risk), *id.* ¶ 22 (alleging Matthew "was a disabled person . . . and was committing no offense"), *id.* ¶ 25 ("[Matthew] was 32 years of age and was suffering from bi-polar [sic] disorder that was

---

[11] The complaint also implies, without claiming, the individual officers violated Matthew's rights under the Americans with Disabilities Act ("ADA"). Compl. ¶ 22. At hearing, plaintiffs' counsel confirmed plaintiffs are not pursuing an ADA claim.

controllable by medication.").  Although defendants moved for summary judgment on this claim, plaintiffs did not respond to defendants' arguments in their opposition.

"Because 'the disabled do not constitute a suspect class' for equal protection purposes, a governmental policy that purposefully treats the disabled differently from the non-disabled need only be 'rationally related to legitimate legislative goals' to pass constitutional muster." *Lee*, 250 F.3d at 687 (quoting *Does 1–5 v. Chandler*, 83 F.3d 1150, 1155 (9th Cir. 1996)).  If plaintiffs intend to bring an equal protection claim, their basis for that claim is unclear.  *See* Compl. ¶ 23 (citing the "equal protection" without elaboration); Opp'n (omitting any analysis of equal protection claim).  Left to guess as to plaintiffs' intentions, the court assumes plaintiffs contend the officers here were improperly trained to interact with people with disabilities because they mistreated Matthew.  Even with this charitable reading, plaintiffs have not explained how this governmental policy "purposefully treats the disabled differently from the non-disabled." *See Lee*, 250 F.3d at 687 (noting same deficiency).  In fact, plaintiffs allege to the contrary that defendants did not treat Matthew differently despite his disability.  *See* Compl. ¶ 14 (alleging defendants' policies permitted wrongful "method of restraining mental patients without consideration of the degree or nature of the care for which the patient is in need . . . ."); Opp'n at 17 (arguing in addressing the officers' use of force that "the officers treated [Matthew] as a suspect" despite knowing he was suffering from mental health issues).  To the extent plaintiffs argue, as defendants suggest, that defendants' facially neutral policies might have had a "foreseeably disproportionate impact on an identifiable group," this is not enough to support an equal protection claim here.  *Lee*, 250 F.3d at 687 (citing *Navarro v. Block*, 72 F.3d 712, 716 n.5 (9th Cir. 1995)).

Plaintiffs have not met their burden in opposing summary judgment and the court GRANTS the motion for defendants on this claim.

B.    Excessive Force Claims

Relying on the Fourth, Fifth and Fourteenth Amendments, plaintiffs allege officers Woods, Hollemon, Smyrnos and Renault used constitutionally excessive force against Matthew. Compl. at 4–9.

11

1           1.     <u>Applicable Law</u>

2          The Fourth, Fifth and Fourteenth Amendments forbid public officials from using

3 excessive force in certain circumstances: The Fourth Amendment prohibits force that renders a

4 search or seizure "unreasonable"; the Fifth and Fourteenth Amendments prohibit force used to

5 "deprive" someone of "life, liberty, or property, without due process of law." *See* U.S. Const.

6 amends. IV, V, XIV; *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2477 (2015) (Scalia, J.,

7 dissenting) (explaining distinction). Plaintiffs' counsel conceded at hearing that the Fifth

8 Amendment does not apply here because no federal actors were involved. The more difficult

9 question is whether the Fourth Amendment's protection against unlawful seizures applies to

10 someone who, as here, was involuntarily committed to psychiatric custody.

11          "In addressing an excessive force claim brought under § 1983, analysis begins by

12 identifying the specific constitutional right allegedly infringed by the challenged application of

13 force." *Graham v. Connor*, 490 U.S. 386, 394 (1989) (citation omitted). Defendants argue that

14 because "Matthew [] was being transported to Redding for admission to a mental health facility

15 pursuant to an order of involuntary commitment under § 5150[,] . . . . his claims are properly

16 brought under the Fourteenth Amendment, not the Fourth." Mot. at 9 (citations omitted). While

17 plaintiffs do not directly respond to this argument, they rely exclusively on the Fourth

18 Amendment in defending their excessive force claim. Opp'n at 10-13.

19          With Matthew's status as a mental health patient involuntarily committed under

20 § 5150 and in transit to a mental health facility, and with police called upon for assistance in

21 providing Matthew with access to mental health care and not in apprehending him as a suspect,

22 none of the case law appears to have contemplated the precise circumstances presented here.

23 Matthew was not a free citizen subjected to excessive force in an "arrest, investigatory stop, or

24 other 'seizure' of his person," *see Graham*, 490 U.S. at 388 (citation omitted), nor was he a

25 pretrial detainee in pre-arraignment custody, *see Gibson v. Cty. of Washoe, Nev.*, 290 F.3d 1175,

26 1197 (9th Cir. 2002), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060

27 (9th Cir. 2016); *Pierce v. Multnomah County*, 76 F.3d 1032, 1043 (9th Cir. 1996). The Fourth

28 Amendment rights that apply in those circumstances therefore do not control here. Further,

because Matthew was already committed under § 5150, the Fourth Amendment's "distinct right to be free from an unreasonable governmental seizure of the person for whatever purpose" seems inapplicable, unless the events at issue here somehow constituted a second and distinct seizure. *See Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1991), *as amended on denial of reh'g* (Apr. 1, 1992) (citing *Graham*, 490 U.S. at 395; *O'Connor v. Donaldson*, 422 U.S. 563, 573-76 (1975)); *see also Nguyen v. Lopez*, 683 F. App'x 620, 621 (9th Cir.), *cert. denied*, 138 S. Ct. 178 (2017) (affirming judgment after bench trial on unlawful detention and excessive force claim brought under Fourth Amendment for detention under § 5150).

There is also a line of authority holding that involuntarily civilly committed individuals retain the right to safe conditions and the right to freedom from bodily restraint, both of which are liberty interests protected by the due process clause of the Fourteenth Amendment. *See Youngberg v. Romeo*, 457 U.S. 307, 315−16 (1982) (addressing substantive due process challenge brought on behalf of adult with significant disabilities who had been committed to a state facility where he was repeatedly injured and physically restrained); *Hydrick v. Hunter*, 500 F.3d 978, 997 (9th Cir. 2007), *cert. granted, judgment vacated on other grounds*, 556 U.S. 1256 (2009) (holding the Fourteenth Amendment governs excessive force claims brought by the "civilly confined" and "requires that civilly committed persons not be subjected to conditions that amount to punishment, within the bounds of professional discretion") (internal citations omitted). Here, too, the fit is imperfect, as Matthew was committed under § 5150 but was not in a facility and the alleged use of force was not committed by facility employees, but by law enforcement officers. *Cf. Gray v. Cummings*, 917 F.3d 1, 4 (1st Cir. 2019) (analyzing under the Fourth Amendment, without considering whether the Fourteenth Amendment applies, excessive force claim brought against officer who tased patient while attempting to return her to hospital to which she had been involuntarily committed under state mental health provision and from which she had absconded); *Lanman v. Hinson*, 529 F.3d 673, 681−82 (6th Cir. 2008) (decedent voluntarily admitted to facility was entitled "to freedom from undue bodily restraint in the course of his treatment" under the Fourteenth Amendment, and "[b]asing this right in substantive due process,

rather than the Fourth Amendment . . . . gives proper deference to the decisions of institutional professionals concerning medical treatment.").

Nonetheless, and ultimately, the Fourteenth Amendment appears to be the proper vehicle for plaintiffs' excessive force claim in the absence of clear authority to the contrary. Notably, following the Supreme Court's decision in *Kingsley*, the court will apply the same objective reasonableness standard here regardless of whether plaintiffs' claim arises under the Fourth or Fourteenth Amendment, as "a pretrial detainee [pursuing an excessive force claim under the Fourteenth Amendment] must show only that the force purposely or knowingly used against him was objectively unreasonable." 135 S. Ct. at 2473. Evaluating an excessive force claim brought by an involuntarily committed mental health patient, the Sixth Circuit explained, *Kingsley* rendered any distinction between the Fourth and Fourteenth Amendments' excessive force standards "purely academic" because, "[i]n light of *Kingsley*, under either amendment, the court would employ the same objective test for excessive force." *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015); *Kingsley*, 135 S. Ct. at 2479 (Alito, J., dissenting) ("It is settled that the test for an unreasonable seizure under the Fourth Amendment is objective, so if a pretrial detainee can bring such a claim, it apparently would be indistinguishable from the substantive due process claim that the Court discusses.") (citing *Graham*, 490 U.S. at 397). *Cf. Castro*, 833 F.3d at 1069 ("Under *Kingsley*, then, it does not matter whether the defendant understood that the force used was excessive, or intended it to be excessive, because the standard is purely objective.") (assessing *Kingsley*'s impact on pretrial detainee's failure to protect claim under the Fourteenth Amendment).

Expressing these reservations and finding the substantive outcome will be the same regardless, the court proceeds under a Fourteenth Amendment analysis. Claims of excessive force brought by involuntarily detained individuals are analyzed under the "objective reasonableness" standard, which considers whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them, regardless of the officer's underlying intent or motive. *Kingsley*, 135 S. Ct. at 2472−73. In analyzing whether an officer's use of force was objectively unreasonable, courts must balance the state's legitimate interest in

14

maintaining order under the circumstances in which the individual is detained, and, where appropriate, "defer[] to the 'policies and practices that in th[e] judgment' of [] officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* at 2473 (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).  Courts may consider a variety of factors to determine whether the force used was objectively unreasonable, including:

> [T]he relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* (citing *Graham*, 490 U.S. at 396).  The objective reasonableness standard cannot be applied "mechanically" because it "turns on the 'facts and circumstances of each particular case.'" *Id.* (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998), latter portion quoting *Graham*, 490 U.S. at 396).

Where, as here, the primary plaintiffs' witness is deceased, the court "must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—[the decedent]—is unable to testify." *Estate of Lopez by and through Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017), *cert. denied sub nom. Gelhaus v. Estate of Lopez ex rel. Lopez*, 138 S. Ct. 2680 (2018) (quoting *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014)).  The court therefore "carefully examine[s] 'all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts.'" *Gonzalez*, 747 F.3d at 795 (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("In other words, the court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.").

### 2. Application

The first use of force in this case involved only Woods, who tackled Matthew and then, after taking Matthew to the ground in a bear hug, struck Matthew in the head with a metal

15

canister several times.  Plaintiffs contend this use of force was excessive and deprived plaintiffs

of their constitutionally protected liberty interest in Matthew's companionship.[12]  The court first

determines if, construing the record in plaintiffs' favor, the conduct here violated a constitutional

right.  As explained above, the analytical framework derives from the Fourteenth Amendment's

substantive due process protections.

Determining whether Woods used excessive force requires the court to wade

through factual disputes and credibility determinations, the classic province of the jury.  Woods

claims he tackled Matthew because Matthew had "punch[ed] [Hollemon] on the face or the upper

body area and start[ed] to lunge forward away from the car."  Woods Dep. 96:15−18, 98:9−16.

Other evidence of record is inconsistent with Woods' account, leaving a factual dispute.

Hollemon testified Matthew used an open hand slap rather than a punch, hitting his elbow rather

than his face or upper body, and that Matthew did not break free because Woods put Matthew in a

bear hug before Hollemon lost control of Matthew's arm.  Hollemon Dep. 65:11−66:3, 79:6−10.

When asked about the severity of Matthew's slap, Hollemon explained he "felt the impact," but it

did not injure or move him, and he could not tell if Matthew was trying to hurt him.  *Id*. at

66:4−12.  Construing these discrepancies in plaintiffs' favor, as required, a reasonable jury could

conclude that Woods did not tackle Matthew because Matthew punched Hollemon in the face and

attempted to flee; a reasonable jury could find Matthew had freed one hand from Woods' grip and

slapped Holleman on the elbow while his other hand remained in Hollemon's grip and reject

---

[12] Although plaintiffs brought their first claim, styled "violation of civil rights," "as the parents of Matthew and as administrators of his estate," Compl. ¶ 11, defendants argue that "[t]here are no federal civil rights claims in the First Cause of Action brought on behalf of plaintiffs Katherine or William Robinson," Mot. at 9 n.9, and further argue that plaintiffs' substantive due process claim for deprivation of familial association was brought solely within their *Monell* claims, Mot. at 19; *see Brown v. Grinder*, No. 2:13-CV-01007-KJM-KJN, 2019 WL 280296, at *13 (E.D. Cal. Jan. 22, 2019) (addressing familial association claim at summary judgment).  While plaintiffs' claims could have been more clearly pleaded, the court finds plaintiffs' allegations are clear enough to assert a familial association claim that does not depend solely on a *Monell* theory of liability.  Because defendants do not brief the merits of such a claim, aside from asserting the claim necessarily fails along with the *Monell* claims, the court declines to sua sponte address the merits of that claim here.

Woods' account and justification for initially tackling Matthew, setting off the events that followed.

        Also reserved for the jury to credit or reject is Woods' contention that, after he tackled Matthew and went to the ground with Matthew on top of him, he beat Matthew's face with a metal can of pepper spray only because he felt Matthew reach for his gun. Woods Dep. 107:4−15.[13] Again, Woods' description lacks corroboration and is inconsistent with other, circumstantial evidence. Both Hollemon and Schneider watched the events unfold, yet neither saw Matthew try to grab Woods' gun. Hollemon Dep. 82:6−83:13; Schneider Dep. 122:2−23. Hollemon testified he never saw Matthew's hands near any weapon, and when asked if he saw Matthew strike Woods, Hollemon explained, "it would have been difficult for him to do so due to the fact that Woods had Matthew's upper arms in a bear hug." Hollemon Dep. 83:11−13, 102:25−103:5. Schneider testified that neither Woods nor Hollemon ever stated that Matthew was reaching or had reached for a gun, though Schneider testified he would have remembered such a statement. Schneider Dep. 122:5−20. Construing this evidence in plaintiffs' favor, without predetermining the resolution, a rational jury could conclude Matthew was immobilized by Woods' bear hug, never tried to grab Woods' gun and that Woods provided this justification only after the fact.

        Fundamentally, there is a dispute over the amount of Matthew's resistance, which construed in plaintiffs' favor, was minimal and did not justify Woods' use of force: Matthew slapped Hollemon's elbow with an open hand, the slap did not move Hollemon, and Matthew never broke free. Matthew was unarmed as well as shorter and roughly 100 pounds lighter than Woods. Woods Dep. 98:17−22 (Woods estimating his height as "[a]bout six feet, maybe a little

---

[13] While defendants note that when Woods first arrived on the scene he believed Matthew may have possessed a piece of plastic from the broken car light, *see* SUF 23, they do not argue Woods believed Matthew was in possession of the piece of plastic or any other weapon when Woods tackled Matthew and hit him with the canister. Rather, defendants cite as Woods' sole justification for the use of force his testimony that Matthew was reaching for his firearm. *See* UMF 29-30; *see also* Schneider Incident Report at 190 (indicating Matthew did not appear to have the plastic from the broken light when he exited the car, as his hands were on his head and he had taken his pants off).

bit shorter" and his weight at 270 pounds); Autopsy Report, Pls.' Ex. 3 at 23 (indicating, "per driver's license," Matthew was five feet, eight inches tall and weighed approximately 160 pounds). Construing the factual record in Matthew's favor, again as required, a reasonable factfinder could conclude Matthew posed little if any threat to the officers and Woods had no legitimate need to violently restrain him.

A reasonable factfinder could also find Woods' response was excessive. Woods admitted he struck Matthew in the face "as hard as [he] could" while holding a metal can. Woods Dep. 105:1−7. He did so without any warning. In his report, Schneider described Woods as "beat[ing] the hell out of [Matthew's] face with the butt of his Mace can." Schneider Report at 7. As a result, Matthew's face "starting bleeding pretty badly, almost instantly swollen from the blows." *Id.* After Woods beat Matthew with the pepper spray can, Schneider and a Restpadd employee "looked at each other like we knew something was wrong," but did nothing because "[y]ou can't pull an officer off . . . a suspect or a patient." Schneider Dep. 134:1−17. Viewed in plaintiffs' favor, a reasonable jury could find Woods's use of force was excessive.

There also is evidence that would permit a reasonable jury to conclude Woods' reaction was vindictive, undercutting his version of events and bolstering plaintiffs' account. Schneider testified that Woods appeared "physically upset that . . . a patient from Butte County was [] taking up Redding police time." Schneider Dep. 87:2−4. He testified that Woods complained that having to deal with Matthew was "a bunch of Butte County bullshit." *Id.* at 86:4−12. Woods himself referred to Matthew as "a nut" and Woods was annoyed at having "to deal with him." Woods Dep. 139:9−22. He admits he threatened "to bring a bunch of cops over there and . . . kick [Matthew's] fucking ass." *Id.* at 38:14−19, 140:5−15. He admits he initially threatened Matthew with a can of pepper spray because Matthew was agitated. UMF 24. With this evidence, a reasonable jury could find Woods tackled Matthew and beat him with the canister not because such force was reasonable under the circumstances but because Woods wanted to punish Matthew, to express his frustration with the situation and to relieve his anger and annoyance.

In sum, construing all disputed facts in plaintiffs' favor, as required, a reasonable jury could find Woods' use of force was unreasonable and violated Matthew's rights.

### 3.    Qualified Immunity

Officers Woods, Hollemon, Smyrnos and Renault argue that even if they used excessive force against Matthew, they are entitled to qualified immunity.  Mot. at 2.

"Qualified immunity is a judge-made doctrine[14] designed to 'balance[ ] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'"  *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011) (quoting *Pearson*, 555 U.S. at 231).  The doctrine is intended to "give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

The two-pronged test currently used for assessing whether qualified immunity applies was first articulated in *Saucier v. Katz*, 533 U.S. 194 (2001).  *Pearson*, 555 U.S. at 232 (citing *Saucier*, 533 U.S. at 201).  Under that test, the court first "decide[d] whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right."  *Id.* (citing *Saucier*, 533 U.S. at 201 and Fed. R. Civ. P. 12, 50, 56).  Then, "if the plaintiff [] satisfied this first step, the court [] decide[d] whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Id.* (citing *Saucier*, 533 U.S. at 201).

"[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."  *Tolan*, 572 U.S. at 656 (citations omitted) (per curiam).[15] "This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine

---

[14]    In light of the judicial origins of the doctrine, the Supreme Court has observed "[a]ny change should come from this Court, not Congress."  *Pearson v. Callahan*, 555 U.S. 223, 234 (2009).

[15] In *Tolan*, the Fifth Circuit erred by failing "to view the evidence at summary judgment in the light most favorable to Tolan with respect to the central facts of this case."  572 U.S. at 658.

the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 249); *see also Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) ("'[T]he ordinary framework for deciding motions for summary judgment' applies to motions for summary judgment based on official immunity.") (citation omitted) (alteration in original). In particular, in determining the established law, the court must take care not to define either the right at issue, or the defendant's conduct for that matter, in a manner that impermissibly resolves factual disputes. *Tolan*, 572 U.S. at 657 ("[C]ourts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions.") (citing *Brosseau v. Haugen*, 543 U.S. 194, 195 (2004)).

Since *Pearson,* courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 555 U.S. at 236. Here, the court has exercised its discretion and analyzed the first merits prong above as to the excessive force claim against Woods, finding plaintiffs have satisfied their burden on the first prong of the qualified immunity analysis.

Turning to the second prong of the qualified immunity analysis, the court notes that clearly established law must be defined with a "high 'degree of specificity.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam)); *Emmons*, 2019 WL 113027, at *2−3. This standard is "demanding." *Wesby*, 138 S. Ct. at 589. The "legal principle [at issue] must have a sufficiently clear foundation in then-existing precedent." *Id.* It "must be 'settled law,' . . . , which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority,'" rather than merely "suggested by then-existing precedent." *Id*. at 589−90 (citations, some internal quotation marks omitted).

While "a case directly on point" is not required "for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate," *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White*, 137 S. Ct. at 551), and must "'squarely govern[]' the specific facts at issue," *id.* at 1153 (citing *Mullenix*,

136 S. Ct. at 309). *See also Pike v. Hester*, 891 F.3d 1131, 1141 (9th Cir. 2018) ("An exact factual match is not required . . . ."). "The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 138 S. Ct. at 590 (quoting *Saucier*, 533 U.S. at 202). Thus, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Mullenix*, 136 S. Ct. at 308) (emphasis, alteration in original).

"Precedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful." *Kisela*, 138 S. Ct. at 1153 (quoting *Mullenix*, 136 S. Ct. at 312). Although "'general statements of the law are not inherently incapable of giving fair and clear warning to officers,' . . . . constitutional guidelines [that] seem inapplicable or too remote" will not suffice. *Id.* (quoting *White*, 137 S. Ct. at 552). Accordingly, "a court must ask whether it would have been clear to a reasonable officer that the alleged conduct 'was unlawful in the situation he confronted.'" *Ziglar*, 137 S. Ct. at 1867 (quoting *Saucier*, 533 U.S. at 202).

In certain cases, qualified immunity may not be available to a defendant even if a new set of circumstances is presented to the court through a civil rights claim. "[T]here can be the rare 'obvious case,' where the unlawfulness of the conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (citing *Brosseau*, 543 U.S. at 199); *see also Ziglar*, 137 S. Ct. at 1867 ("[A]n officer might lose qualified immunity even if there is no reported case 'directly on point.' But 'in the light of pre-existing law,' the unlawfulness of the officer's conduct 'must be apparent'" (quoting *Anderson*, 483 U.S. at 640)). In some circumstances "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *Bonivert v. City of Clarkston*, 883 F.3d 865, 872 (9th Cir. 2018) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

Because resolving whether the asserted federal right was clearly established presents a pure question of law, the court draws on its "full knowledge" of relevant precedent rather than restricting its review to cases identified by plaintiff. *See Elder v. Holloway*, 510 U.S.

510, 514−16 (1994) (citing *Davis*, 468 U.S. at 192 n.9). In so doing, the court "first look[s] to binding precedent to determine whether a law was clearly established." *Ioane v. Hodges*, 903 F.3d 929, 937 (9th Cir. 2018) (citing *Chappell v. Mandeville*, 706 F.3d 1052, 1056 (9th Cir. 2013)); *see Carrillo v. Cty. of Los Angeles*, 798 F.3d 1210, 1221 (9th Cir. 2015) ("'clearly established law' includes 'controlling authority in [the defendants'] jurisdiction'" (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)) (alteration in original). If no binding precedent "is on point, [the court] may consider other decisional law." *Chappell*, 706 F.3d at 1056. Ultimately, "the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp v. Cty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (citing *Wilson*, 526 U.S. at 617).

C.      Prong Two Analysis: Officer Woods

The court analyzes the second qualified immunity prong by determining whether Matthew's right to be free from being repeatedly struck in the head with a metal cannister as hard as possible, while his arms were immobilized in Woods' bear hug, was "clearly established" in July 2014. If so, Woods is not entitled to summary judgment on qualified immunity. Here, having examined precedent that existed before the relevant date of July 2014, the court concludes that all reasonable officers would have understood it to be unlawful to repeatedly strike Matthew, who was approximately one hundred pounds lighter than Woods and had his arms restrained at his side in Woods' bear hug, with a pepper spray canister.

It has been clearly established since at least 2007 that an officer may not punch an arrestee without provocation, placing Woods' conduct here soundly outside clearly established law. In *Blankenhorn*, for example, plaintiff was suspected of the "minimal" crime of misdemeanor trespass. *Blankenhorn v. City of Orange*, 485 F.3d 463, 478 (9th Cir. 2007). When an officer grabbed his arm, plaintiff pulled free, prompting the officer to threaten him with mace. *Id.* Plaintiff then "threw his driver's license on the ground, but he did not take a combative stance, clench his fists, or otherwise make threatening gestures." *Id.* When plaintiff refused the officer's order that he kneel to be handcuffed, "[a]lmost immediately," the officers "gang-tackled him" and took plaintiff to the ground after several moments of struggle. *Id.* As plaintiff lay on

22

the ground, one officer punched him several times, claiming the punches were necessary to "distract" plaintiff and cause him to momentarily relax and release his "arms out from underneath him [to allow the officer to] secure the handcuffs." *Id.* at 480. Crediting "[plaintiff's] claims [that] he never pinned his arms underneath his body," as required at summary judgment, the officer had no "need for any use of force to release [plaintiff's arms], and thus [the Officer's] punches were not reasonably justified by the circumstances as he claims." *Id.* (footnote omitted). In addressing whether the right at issue was clearly established, the panel looked no further than *Graham v. Connor*'s "holding that force is only justified when there is a need for force," concluding "[t]his [] principle would [] adequately put a reasonable officer on notice that punching [plaintiff] to free his arms when, in fact, he was not manipulating his arms in an attempt to avoid being handcuffed, was also a Fourth Amendment violation." *Id.* at 481; *see Graham v. Connor*, 490 U.S. at 386.

Here, too, Woods claims he used "distraction strikes" to prevent Matthew from grabbing hold of his firearm, and here, too, the facts construed in plaintiff's favor indicate Matthew never reached for Woods' weapon. *See* Mot. at 5, 7 (citing Woods' testimony). It is axiomatic, at least since the Supreme Court's 1989 decision in *Graham*, that an officer's use of force must be proportional to the need for such force. If any doubt were possible, *Blankenhorn* made clear that this proportionality concept bars an officer from employing distraction strikes where there is no need to distract a suspect. As of 2014, no reasonable officer could entertain any doubt as to whether he could lawfully strike a mental health patient, whose arms were pinned to his side, with the strike administered using a closed fist, much less a closed fist clutching a metal canister. With the facts properly construed as required at the summary judgment stage, Matthew's right to remain free from this use of force was clearly established.

Other cases provide a useful backdrop to the law that was established for the purposes of this case involving a mentally disturbed individual. First, as of 2001, the Ninth Circuit had observed that "[t]he problems posed by, and thus the tactics to be employed against an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and

dangerous criminal who has recently committed a serious offense." *Deorle v. Rutherford*, 272

F.3d 1272, 1282−83 (9th Cir. 2001).[16]  There, an officer shot an "emotionally disturbed"

individual in the face with a lead-filled "less-lethal" beanbag because the individual, who was

drunk, verbally abusive, suicidal and carrying a can or bottle, was walking steadily towards the

officer.  *Id.* at 1275-77.  The beanbag round, "akin to a rubber bullet" and potentially lethal at

distances up to fifty feet, constituted force capable of causing serious injury and was permissible

only if compelled by a strong governmental interest.  *Id.* at 1279−80.  It "knocked Deorle off his

feet, [] removed one of his eyes" and "left lead shot implanted in his skull."  *Id.* at 1275, 1279.

While the court did not adopt a "per se rule establishing two different classifications of suspects,"

namely, "mentally disabled persons and serious criminals," *id.* at 1283, it emphasized "that where

it is or should be apparent to the officers that the individual involved is emotionally disturbed,

that is a factor that must be considered" in determining the reasonableness of a use of force, *id.*

   In 2010, *Bryan v. MacPherson* applied *Deorle* to new facts, finding on the merits

that an officer used excessive force when he tased the plaintiff, Bryan, in dart mode and without

warning, when Bryan was "a half naked, unarmed, stationary, apparently disturbed individual

shouting gibberish at a distance of approximately twenty feet," during a traffic stop.  630 F.3d

805, 828 (9th Cir. 2010).  The scenario was "tense" and Bryan's behavior was "bizarre," but the

government had only a "minimal" and thus "insufficient" interest in using intermediate force to

subdue Bryan.  *Id.* at 831−32.  Rejecting the officer's contention that "use of the taser was

justified because he believed Bryan may have been mentally ill and thus subject to detention," the

court explained, "if Officer MacPherson believed Bryan was mentally disturbed he should have

[16] The Supreme Court has twice "instructed the [Ninth Circuit] not to read [*Deorle*] too broadly in deciding whether a new set of facts is governed by clearly established law."  *Kisela*, 138 S. Ct. at 1154 (citing *Sheehan*, 135 S. Ct. at 1776).  The court here is taking care to not run afoul of that admonition.  *Deorle* bears little resemblance to *Kisela*, which involved an armed, mentally-ill individual who ignored orders to drop "a large knife," was "within striking distance" of a bystander, and where "the situation unfolded in less than a minute."  *Kisela*, 138 S. Ct. at 1154.  *Deorle* is similarly distinguishable from *Sheehan*, in which  the plaintiff, "[u]nlike Deorle, [] was dangerous, recalcitrant, law-breaking, and out of sight."  *Sheehan*, 135 S. Ct. at 1776. Here, construing the record in plaintiffs' favor, Matthew was not armed, he was not dangerous, he was within the officers' grasp and he did not endanger bystanders.  The Court's warnings, therefore, do not preclude this court's citation to *Deorle*.

made greater effort to take control of the situation through less intrusive means." *Id.* at 829.

Confirming the principle it had articulated in *Deorle*, the court observed:

> A mentally ill individual is in need of a doctor, not a jail cell, and in the usual case—where such an individual is neither a threat to himself nor to anyone else—the government's interest in deploying force to detain him is not as substantial as its interest in deploying that force to apprehend a dangerous criminal. Moreover, the purpose of detaining a mentally ill individual is not to punish him, but to help him.

*Id.* Thus, while "[t]he government has an important interest in providing assistance to a person in need of psychiatric care; [] the use of force that may be justified by that interest necessarily differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community." *Id.* The officer was "confronted by, at most, a disturbed and upset young man, not an immediately threatening one," and, ultimately, his use of force was excessive when balanced against the governmental interests at stake. *Id*. at 827, 832.[17]

Deorle articulated the need for an officer facing a mentally-disturbed person to consider, as one factor, how the person's status informs any use of force. *Bryan* built on this principle, explaining that even when a mentally-disturbed person behaves erratically, erratic behavior does not entitle an officer to use force, and any force used must be proportional to the actual danger posed. When the events at issue here unfolded, construing those events in Matthew's favor, Woods confronted an emotionally disturbed individual whose behavior did not warrant the force used. Qualified immunity does not apply simply because "a novel method is used to inflict injury." *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994); *Hope*, 536 U.S. at 741 ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.") (internal quotation marks omitted) (quoting *Lanier*, 520

---

[17] Ultimately, because no controlling authority had yet clearly established as unconstitutional the use of a taser in dart mode, as used by the officer, the officer was entitled to qualified immunity. *Id.* at 833.

U.S. at 271).  Under the facts presented at summary judgment, it would have been unlawful for Woods to strike Matthew with a closed fist.  *See Blankenhorn*, 485 F.3d at 481.  It also was unlawful, then, for Woods to strike Matthew with a can of pepper spray held in Woods' closed fist.  The use of a can of pepper spray does not introduce a materially different fact so as to preclude the identification of clearly established law as applicable here.  Taking account of Matthew's mental status, which was known to Woods, no reasonable officer could believe Woods' conduct was lawful.

In sum, construing the evidence in plaintiffs' favor, the court concludes Woods crossed a clearly established constitutional boundary.  Matthew weighed 100 pounds less than Woods, and his arms were pinned defenseless in a bear hug when Woods repeatedly struck his face with a metal canister.  Matthew remained within Woods' or Hollemon's control at all relevant times.  Woods' use of force was untempered, unjustified and violated clearly established law.

The court DENIES summary judgment on plaintiffs' Fourteenth Amendment excessive force claims against Woods.

D.      Prong One and Two Analysis: Officers Smyrnos, Renault and Hollemon

After striking Matthew, Woods rolled out from under him and pinned Matthew to the ground by lying on top of him.  SUF 31.[18]  Hollemon attempted to restrain Matthew's legs and Woods, along with Smyrnos and Renault, who had arrived to assist, handcuffed Matthew.  SUF 31, 33.  The next forceful encounter involved Smyrnos, Hollemon and Renault.  Woods,

---

[18] Plaintiffs appear to argue that Woods' lying on top of Matthew also constituted excessive force.  *See* Opp'n at 13 ("Prevailing precedent in the Ninth Circuit is that law enforcement officers [sic] use of body weight to restrain a prone and handcuffed individual in an agitated state, [sic] can cause suffocation 'under the weight of restraining officers' therefor, such conduct maybe [sic] considered deadly force.") (citing *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) ("The officers—indeed, any reasonable person— should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable.").  But plaintiffs concede that Matthew was not handcuffed and did not have trouble breathing while Woods lay on top of him and thus do not clearly argue this act constituted a clearly established violation of Matthew's constitutional rights.  UMF 31−35.

who had Matthew's blood on him and whose back was injured from the fall, returned to his car. SUF 34. Noticing saliva and blood projecting from Matthew's face as he screamed, Smyrnos placed a mesh "spit hood" over Matthew's head to protect the officers from possible contamination. SUF 41; *see* Pls.' Resp. to SUF 41 (noting there is no evidence Matthew intentionally spit). Smyrnos testified he sat near Matthew's head to make sure he could still hear Matthew breathing the entire time the spit hood was on. Smyrnos Dep. 20:25−21:24. Brindley testified that when he arrived on the scene, Matthew was wearing the spit mask and, at some point thereafter, "[Brindley] believe[d] . . . . Smyrnos was down at [Matthew's] feet and was trying to control his feet," creating a dispute as to whether Smyrnos, or anyone, monitored Matthew's breathing the entire time the spit mask covered his face. *See* Brindley Dep. 9:15−20, 28:12−14, 30:11−21, 45:5−7). Testimony indicates Matthew breathed normally at first, but his breaths slowed and become labored, though he still had a pulse. Smyrnos Dep. 51:9−25. As the officers were applying leg restraints, Matthew stopped yelling and resisting. *Id.* at 20:1−3. One to two minutes later, Matthew stopped breathing. *Id.* at 20:11−15. At some point, though it is unclear when, Smyrnos heard Matthew making a "gurgling" sound. *Id.* at 25:10−17. The officers removed the spit hood, but Matthew never recovered. *Id.* at 25:14−17. He died eight days later.

Although "[p]lacing a spit mask over a person's head is not an inherently obvious method of causing someone harm," *Barnett v. Norman*, No. 1:05-cv-01022-YNP-PC, 2010 WL 1006525, at *5 (E.D. Cal. 2010), plaintiffs contend using a spit hood here, where the risk of suffocation was apparent with Matthew's bodily fluids pouring from his nose, mouth and face, constitutes excessive force. Opp'n at 14. Spit hoods may be appropriately used when the subject is bleeding from the face. *See, e.g.*, *Allen v. Rivera*, 626 F. App'x. 710, 712 (9th Cir. 2015) (upholding defense verdict in excessive force claim under the Eighth Amendment[19] where officer

---

[19] Convicted prisoners' excessive force claims derive from the Eighth Amendment's Cruel and Unusual Punishment Clause and thus differ from excessive force claims brought by non-prisoners under the Fourth and Fourteenth Amendments. *See Kingsley*, 135 S. Ct. at 2475 (noting differences in claims). In *Allen*, the panel found "[t]here was [] not substantial evidence from which a jury could have concluded that [defendant] applied the spit mask 'maliciously and

placed spit hood over the prisoner's face despite his bloody lip and runny nose, citing "uncontradicted testimony that a spit mask is properly applied . . . whenever there is a threat of transmission of bodily fluid" and "there [was] no evidence that the impact on [plaintiff's] breathing affected his ability to function, caused him pain, or had any effect on his health once the mask was removed"). But, as the spit hood manufacturer warns, "IMPROPER USE . . . CAN CAUSE INJURY OR DEATH"; "Improper use may cause asphyxiation, suffocation or drowning in ones [sic] own fluids; "DO NOT USE on anyone that is . . . having difficulty breathing, or is bleeding profusely from the mouth or nose area." Spit Hood Warning, Defs.' Ex. A(11), ECF 68-2, at 2−3.

Here, the record is unclear as to amount and source of Matthew's bleeding, including whether he bled from his nose. Plaintiffs cite evidence he was bleeding from multiple parts of his face, but predominantly a cut on his forehead. Opp'n at 18 (citing autopsy findings "Matthew Robinson had . . . a broken nose, and facial lacerations of the facial muscles"); *id.* at 23 (noting Smyrnos reported that in applying the spit hood, "[Matthew's] head was very difficult to control as it was bloody and sweaty") (quoting Pls.' Ex. 10 at 102); *id.* (citing Pls.' Ex. 5 at 39−42, "photographs of the blood pools that were left at the scene photographed by the Redding Police Department" and "Autopsy photographs show[ing] the extreme depth of the wounds on Robinson's head . . . and the autopsy description that the wound extended through the skin and into the muscle tissue"). Although emergency room notes acknowledge a "[m]ildly displaced anterior nasal bone fracture," neither those notes, nor the coroner's report nor the autopsy report mention nasal bleeding. *See* Emergency Notes, Pls.' Ex. 4 at 36; Autopsy Report at 24 (listing fractures and cuts on Matthew's face without identifying a nasal fracture). Smyrnos testified there was blood was "all over [Matthew's] face" but admits it was unclear where the blood was coming from. Smyrnos Dep. 11:15−17, 49:16−50:7 ("I didn't know if he was bleeding from his mouth or if it was blood that was coming down his head that was getting in front of his face.");

sadistically for the very purpose of causing harm,' as is required for an Eighth Amendment excessive force claim." *Allen*, 626 F. App'x at 712 (citation omitted).

28

*see* Pls.' Ex. 5 at 39 (photograph of Matthew on stretcher with blood on face).  Smyrnos also admits that how much the person is bleeding and from where determines whether it was reasonable to use a spit hood.  *See* Smyrnos Dep. at 16:24−17:6 (Q: "So is it your understanding that blood and mucous wouldn't block the air permeability of the mask?" . . . . A: "Depends on the amount, depends on the volume that was coming out, depends on the location that it was coming from."); *see also* Opp'n at 18 (arguing plaintiffs' expert demonstrated that blood and nasal excretions cause "an almost total blockage of air" from the spit mask).

Even construing uncertainties in plaintiffs' favor, the officers are entitled to qualified immunity.  The court has found no clearly established law predating July 2014 that would put every reasonable officer on notice that using a spit hood in this scenario constitutes a constitutional violation, and certainly no authority that "place[d] the . . . constitutional question beyond debate."  *See White*, 137 S. Ct. at 551 (citation omitted).  While the officers' disregarding the manufacturer's warning raises questions as to the reasonableness of the officers' actions, given the absence of authority, the manufacturer's warning standing alone could not clearly establish a constitutional boundary.  *See Sharp*, 871 F.3d at 911 (if not an obvious case, "the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction.") (citation omitted).  *Cf. Allen*, 626 F. App'x at 712 (noting "uncontradicted testimony that a spit mask [may be] properly applied . . . whenever there is a threat of transmission of bodily fluid" and finding "the officers escorting [plaintiff] had reason to protect themselves from purposeful or inadvertent transmission of bodily fluids" where "there [was] no evidence that the impact on [plaintiff's] breathing affected his ability to function, caused him pain, or had any effect on his health once the mask was removed").  Because spit hoods protect officers from contamination by bodily fluids and because Matthew was indisputably bleeding from his face, it was not an obvious constitutional violation for Smyrnos to deploy the spit hood under the circumstances here, and no prior court decision would have alerted him otherwise.  Stated differently, the law was not so clear that every reasonable official facing this scenario would have known using a spit hood was unlawful.  *See Isayeva*, 872 F.3d at 947.  The officers are immune from liability for this decision.

Additionally, no reasonable juror could find these officers liable for Woods' potential misconduct through an "integral participant" theory, which this court has addressed recently. *See Brown v. Grinder*, No. 213CV01007 KJM KJN, 2019 WL 280296, at *12 (E.D. Cal. Jan. 22, 2019) (describing integral participation theory) (citations omitted). Woods' use of force was distinct from the later use of a spit mask by Hollemon, Smyrnos and Renault. Hollemon was a bystander to Woods' alleged use of excessive force in hitting Matthew's head, and that use of force took place before Renault and Smyrnos arrived. *See Chuman v. Wright*, 76 F.3d. 292, 294−95 (9th Cir. 1996) (finding "[b]eing a mere bystander [i]s insufficient" for integral participant liability and rejecting instruction that "allows the jury to lump all the defendants together, rather than require it to base each individual's liability on his own conduct."). Here, Woods' use of force transpired rapidly: Upon seeing Matthew slap Hollemon, Woods tackled Matthew and then, without warning, struck him in the face three to five times. No rational factfinder could find Hollemon was an integral participant in Woods' allegedly unconstitutional act. *See Brown*, 2019 WL 280296, at *12 (noting courts have found "an officer who provides armed backup or participates in an unconstitutional police action with knowledge that action will be taken but without objecting may be liable under the integral participation doctrine") (citations omitted).

Because Smyrnos, Renault, and Hollemon are entitled to qualified immunity as to their own conduct, and because no rational factfinder could find them liable for Woods' conduct, the court GRANTS summary judgment for Smyrnos, Renault and Hollemon on plaintiffs' excessive force claims.

E.    Conclusion: Section 1983 Claims Against Individual Officers

Only the Fourteenth Amendment excessive force claim against Woods survives summary judgment. The court GRANTS summary judgment on all remaining § 1983 claims against the individual officers.

IV.    MUNICIPAL LIABILITY

Plaintiffs also bring § 1983 claims against the City under *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978) for allegedly unconstitutional policies and practices.

Plaintiffs may support their *Monell* claim through three possible theories, by showing: (1) official policies or established customs inflicted the alleged constitutional injury; (2) omissions or failures to act reflect a local government policy of deliberate indifference to the constitutional rights at issue; or (3) a City employee with final policy-making authority ratified a subordinate's unconstitutional act. *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1249−50 (9th Cir. 2010), *overruled on other grounds by Castro*, 833 F.3d 1060.

Plaintiffs argue only, "the only resulting municipal action regarding the incident was that Officer Woods received a letter of reprimand for using vulgar language and Officer Hollemon was declared Officer of the Year." Opp'n at 28. It is unclear whether plaintiffs intend to invoke all three *Monell* theories with this argument. *See id.*; Compl. ¶¶ 33-41 (alleging City was aware of Woods' and Hollemon's "propensities for violence" and history of unreasonable force, City had policy of using force in arrests and inadequately disciplining officers, defendants were acting under City policies, and officers were improperly trained). Defendants argue plaintiffs cannot survive summary judgment on any theory. Mot. at 19−21.

Plaintiffs' custom or practice theory can survive only if "founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), *holding modified on other grounds by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001). Plaintiffs have not established such a custom or practice here, but instead impermissibly attempt to establish "the existence of a municipal policy or custom based solely on the occurrence of a single incident or unconstitutional action by a non-policymaking employee." *See Nadell v. Las Vegas Metro. Police Dep't*, 268 F.3d 924, 929 (9th Cir. 2001) (emphasis and citation omitted), *abrogated on other grounds as recognized in Beck v. City of Upland*, 527 F.3d 853, 862 n.8 (9th Cir. 2008). Woods is not a policy-making employee, and plaintiffs cite no other excessive force incidents indicating a general trend, custom or series of omissions by City law enforcement. This is true for plaintiffs' ratification theory, too, which is based on the City's punishments, or lack thereof, for this single incident. *See* Opp'n at 28 (citing Hollemon's and Woods' inadequate punishments as to this incident only); *Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011) (noting

"repeated constitutional violations" that have gone unpunished may show an official ratification policy).

Plaintiffs' "failure to train" theory is similarly flawed. To succeed on such a theory, "the failure to train [must] amount[] to deliberate indifference to the rights of persons with whom the police come into contact." *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Rather than identifying a constitutionally inadequate training regimen, plaintiffs contend the defendant officers violated their training in this isolated incident. *See* Opp'n at 15−16 (citing training for law enforcement "contact with an emotionally disturbed or mentally ill person" and arguing defendants violated that training in interacting with Matthew); *see also Harris*, 489 U.S. at 390−91 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."). It is true that if "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, [] the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. But plaintiffs make no attempt to show that is the case here.

In sum, plaintiffs' opposition cites no evidence to support their *Monell* claims. The court GRANTS summary judgment for the City.

V.      STATE LAW CLAIMS

Plaintiffs also assert state-law claims. As detailed below, the record does not support certain claims and the parties have insufficiently addressed others. The court grants and denies summary judgment in part.

A.      Wrongful Death—Negligence

Noting that plaintiffs allege, in passing, a variety of state law torts, defendants construe plaintiffs' complaint as asserting a negligent wrongful death claim under California law and move for summary judgment on that claim. Mot. at 21; *see* Compl. ¶ 28. Plaintiffs do not dispute defendants' characterization and do not clearly defend their wrongful death claim, though their briefing indirectly addresses defendants' arguments.

32

To prove negligence, "a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 629 (2013) (alteration in original) (citations omitted). "[D]uty is a critical element of negligence liability." *Id.* The California Supreme Court "ha[s] long recognized that peace officers have a duty to act reasonably when using deadly force." *Id.* at 637 (citations omitted). To determine reasonableness, state negligence law, like the objective reasonableness test, requires a consideration of the totality of the circumstances surrounding any use of deadly force. *See id.* But "state negligence law . . . is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used." *Id.* (internal citations omitted); *see also Mulligan v. Nichols*, 835 F.3d 983, 991 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 2121 (2017) ("[N]egligence claims under California law encompass a broader spectrum of conduct than excessive force claims under the Fourth Amendment.").

As discussed above, the federal excessive force claim against Woods must be presented to a jury. On this record, and addressing only defendants' brief argument on this issue, that conclusion is sufficient to deny summary judgment as to the wrongful death claim against Woods. *See Hayes*, 57 Cal. 4th at 639 (noting that under California law, officers' "tactical conduct and decisions preceding the use of deadly force are relevant considerations . . . in determining whether the use of deadly force gives rise to negligence liability"); *Adamson v. City of San Francisco*, No. 13-CV-05233-DMR, 2015 WL 5467744, at *10 (N.D. Cal. Sept. 17, 2015) (citing denial of summary judgment on excessive force claim as basis for denying summary judgment on negligence claim). Because defendants do not acknowledge the difference between the California and Fourth Amendment analyses, the court DENIES summary judgment as to all defendants.

B.    Fifth Claim: Disability-Based Violence

Plaintiffs allege they are entitled to recovery under California Civil Code § 51.7 for violence against Matthew based on his disability. Compl. ¶¶ 47−50. To succeed on this

claim, plaintiffs must prove Mathew's disability was "a substantial motivating reason for" the defendants' conduct. Judicial Council of California Civil Jury Instruction 3063.

Defendants devote only one paragraph to this claim. *See* Mot. at 22. Plaintiffs do not directly respond. Regardless, the record before the court includes sufficient evidence to deny defendants' motion as to Woods. That evidence indicates the officers were aware they were responding to a call for assistance with a § 5150 patient and thus were presumably aware Matthew suffered from mental health issues. There is evidence that Matthew exhibited symptoms of his mental health issues and the officers, Woods in particular, responded with hostility to those symptoms. He referred to the call for assistance as "Butte County bullshit," he responded to Matthew's behavior by threatening to kick his ass and spray him with pepper spray. He later referred to Matthew as a "nut." On this record, there is evidence from which reasonable jurors could conclude Woods was hostile to and motivated by Matthew's disability when he tackled Matthew and hit him with the pepper spray canister. There is insufficient evidence as to the remaining defendants and, as noted, plaintiffs have made no attempt to prove otherwise. The motion is DENIED as to Woods and GRANTED as to all other defendants.

C.     Sixth Claim: Negligent Hiring

Plaintiffs bring their sixth claim for "negligent hiring" against Chief Paoletti, as well as other unidentified "superior officers" and the City. The claim also includes allegations of negligent training, retention and supervision. Compl. ¶¶ 51−53. These claims cannot withstand summary judgment on this record.

Direct tort liability of public entities must be based on a specific statute declaring the entities as to be liable or at least creating some specific duty of care. *Eastburn v. Reg'l Fire Prot. Auth.*, 31 Cal. 4th 1175, 1179−80 (2003) (citing Cal. Gov't Code § 815(a) ("Except as otherwise provided by statute: (a) A public entity is not liable for an injury, . . . .")). Plaintiffs cite no such statute here. Further, plaintiffs have not advanced a vicarious liability claim and provide no evidence that Chief Paoletti or any other "superior officers" were personally involved in hiring or training any defendant. *See* Cal. Gov't Code § 815.2(a) (allowing a public entity to be sued in tort on a respondeat superior theory of vicarious liability); *Hoff v. Vacaville Unified Sch. Dist.*, 19

Cal. 4th 925, 932 (1998) (explaining § 815.2(a) "expressly makes the doctrine of respondeat superior applicable to public employers"). Plaintiffs do not defend this claim in their opposition, much less identify evidence of record indicating that the individual officers had a violent history or that the Chief was aware of any such history but chose to ignore it. Lastly, as explained above in discussing *Monell* liability, there is no evidence of inadequate training. With these deficiencies and no argument from plaintiffs defending this claim, there is no viable basis for plaintiffs' negligent hiring claim and the motion is GRANTED.

VI.    CONCLUSION

Defendants' summary judgment motion is adjudicated as follows:

- First cause of action: DENIED on the Fourteenth Amendment substantive due process excessive force claim against Woods only, GRANTED as to the other defendants and on the remaining § 1983 claims;

- Second and fourth cause of action: DENIED on the state law claim for wrongful death;

- Third cause of action: GRANTED on the § 1983 municipal liability claim;

- Fifth cause of action: DENIED as to Woods and GRANTED as to the other defendants on the state-law disability-based violence claim; and

- Sixth cause of action: GRANTED on the state law negligent hiring claim.

The court sets a final pretrial conference for June 28, 2019. The parties shall file a Joint Final Pretrial Conference Statement fourteen (14) days before, including the information required by the court's pretrial scheduling order, ECF No. 56.

IT IS SO ORDERED.

This resolves ECF No. 66.

DATED: May 1, 2019.

_____
UNITED STATES DISTRICT JUDGE